| 58 | 235 |
| 46a | 356 |
| 58 | 235 |
| 110 | 98 |
| 110 | 137 |
| 58 | 235 |
| 114 | 453 |
| 117 | 293 |
| 58 | 235 |
| 142 | 668 |
| 58 | 235 |
| 82a | 100 |

JOHN ECK, by his Guardian THOMAS T. TAYLOR, Appellant, vs. THOMAS E. HATCHER, et al., Respondents.

1. *Practice, civil—Testimony of opposite party—How compelled.*—Sections 3, 7 & 9 of the act concerning witnesses, were intended to have the office and effect of the old chancery practice, in regard to interrogatories appended to a bill and to sift the conscience of the opposite party in like manner.

2. *Notice—Party will be affected with, when put on inquiry.*—In suit to set aside the sale of land for fraudulent practices, the purchaser will be held to have knowledge thereof where the circumstances of the sale evidently required investigation and were such as to put him on inquiry.

*Appeal from Adair Circuit Court.*

*O. D. Jones & W. C. Hollister, with Harrington & Cover,* for Appellant.

*Pratte & McCabe, with Ellison & Ellison,* for Respondents.

NAPTON, Judge, delivered the opinion of the court.

This is a suit instituted by a pauper, through his guardian, to set aside certain conveyances alleged to have been fraudulently obtained by the defendants, one of whom is his wife, the second a son-in-law of his wife, and the third a purchaser from the second.

The facts upon which the petition is based, and which seem to be beyond controversy, are these: The plaintiff is a German, at the time of the trial about seventy-five years old, speaking the English language imperfectly, and though a very good farmer, a man of excitable temperament, and of such occasional eccentricity of habits, as to raise a question of his sanity. He lived, in 1870, in Quincy, Illinois, and married a woman, one of the defendants, who was proved to be of bad repute and the keeper of a house of ill-fame, in which her daughter, the reputed wife of another defendant, played a conspicuous part. This woman was about forty years old, and Eck, the real plaintiff, who was seventy-two, was entrapped into a marriage with her. Eck was a man of considerable means, having from four to six thousand dollars in money or notes—and this was the lure which tempted the defendant, his wife, to marry him.

Eck and his wife, in 1871, removed from Quincy, and came to Lewis county and lived awhile with one Steffin, whose farm was near the town of Newark, in Knox county, and who was, I infer from his name, probably also a German by extraction or birth, and perhaps an acquaintance of Eck's. The object of Eck was to buy a farm, and after negotiating with McElhany, who was a farmer in Knox county, and had a farm for sale, and, concluding not to purchase it, he bought the farm of Brown, which was near Newark, for $2,800 or $3,000. Eck and his wife then moved from Steffin's place to this farm. The deed to the place was made to Eck, but this was not in accordance with the designs of his wife, who insisted that the deed should be made to her.

It seems that there lived at Newark, at the time, one James M. Balthorpe, who was an attorney at law, and a dealer in cattle, and that McElhany, who imagined that he had a right of action against Eck, for failing to comply with his alleged verbal promise to buy his farm (which Eck denied), employed this Balthorpe to bring a suit against him, or to threaten him with one. This occasioned frequent visits from Balthorpe to Eck's house, and as he knew, if he was a lawyer at all, that there was no foundation for any such action, he soon formed an alliance with Mrs. Eck, to aid her in driving her husband into the execution of a deed to his wife, which was finally effected on July 1, 1871, when Eck executed such a deed.

In the fall of 1871, John E. Grandy, another defendant in this case, who purported to be the husband of the daughter of Mrs. Eck (proved to have been a prostitute in Quincy by the chief of police of that city), with his wife, came over from that city and made their home at Eck's house.

After this accession to the household, the old man Eck seems to have succumbed, and, under various forms of persecution, devised by his wife and her son-in-law and their lawyer—aided by some neighbors, among whom the most prominent was Jeremiah Moore,—was finally intimidated into the execution of a deed to this son-in-law, on the 22d of February, 1872. It is not clear that Eck ever signed this deed—

he swears on the trial that he did not—but whether he did or not is immaterial. There is no pretense that this deed or the one to his wife was based on any consideration whatever, unless we attach some importance to the pretension that he promised to convey *all his property* to his wife, previous to his marriage—a promise which, if proved, no sane man would ever comply with, and no court would ever compel him to comply with.

Thus, about the 1st of March, 1872, but little over a year after his purchase, the conspirators against Eck succeeded in getting the title to this land in this man Grandy, and then it became necessary as soon as practicable, to put that title in some innocent purchaser, for a valuable consideration without notice. It would have been manifestly a hopeless undertaking to find such a purchaser in the neighborhood of Newark, where Eck and his character, and the character of his wife and the pecuniary condition of her son-in-law, and the lawsuits and other controversies between the parties, were notorious. Accordingly Balthorpe starts to Palmyra, the county seat of a neighboring county, and calls upon the defendant, Hatcher, said to be a citizen of good standing and ample fortune, worth from seventy to eighty thousand dollars, and tells him of this farm being in the market at $1,800, and tells him (as he swears) that and nothing more. Hatcher agrees to buy, borrows of Balthorpe one thousand dollars, being at that time, *short ;* dispatches Balthorpe with a letter to Jeremiah Moore, the neighbor of Eck, heretofore named, authorizing said Moore to purchase, and the purchase is consummated, and a deed to Hatcher made on the 20th May, 1872. And then Mrs. Eck and her son-in-law, {Grandy and his wife, through the aid of this Jeremiah Moore, who loaned his horse and driver to assist them, immediately before daybreak the next morning, after the execution of this deed, went to Shelbina, on the railroad, and left for parts unknown, and have never been since heard from ; and thus, Eck was driven from his house, stripped of everything he had, in the course of one short year, and very soon afterwards was a pauper, in charge of the county, and found by an inquest to be insane.

Negroes in the neighborhood were placed in possession of his house by Moore, and when Eck ceased to disturb them, Moore's son occupied, as a tenant, under Hatcher. These facts are really undisputed, though there were witnesses called on the question of Eck's sanity, on which, as usual, very different opinions were expressed. We attach no importance to this question or to the opinions of the witnesses concerning it. Eck's acts, without regard to any scientific analysis of the precise source from which they sprung, certainly indicated a singularly weak, or badly regulated mind. His marriage, his ineffectual efforts to relieve himself of the incubus which this created, his vacillation in his lawsuits, his conduct when he despaired of success, his credulity in believing the threats of incarceration made by his wife and Balthorpe, and his ultimate submission to what he seemed to regard as his fate, are enough to show that he was unfitted to cope with such shrewd and unscrupulous speculators as he had to deal with. The details of the evidence in this case, which show these facts, seem to be unnecessary, since the only point relied on here, and probably the only one made below, is that Hatcher is an innocent purchaser.

Hatcher was subpœnaed as a witness by the plaintiff, but never appeared. His answer denies all knowledge of the facts except as they appear of record—but was filed by his attorneys, and not sworn to. He declined to appear and testify. It seems that Balthorpe was the first who advised Hatcher of the land being in market, and that Hatcher made Moore his agent to purchase it. Moore lived on a farm immediately adjoining that of Eck, and knew the whole history of the difficulties between Eck and his wife, and of the lawsuits, among which was one in which Eck was plaintiff, to set aside the deeds to his wife and Grandy, and which was undetermined at the date of Hatcher's purchase through Moore.

Hatcher, it seems, bought the land without even looking at it. All that he was informed about by Balthorpe was the price. But Balthorpe declares that Hatcher was well acquainted with the land before. Upon this point Hatcher

was himself competent to testify, and our statute (Wagn. Stat., 1373, § 3) declares that "any party to any civil action or proceeding may compel any adverse party, or any person for whose immediate and adverse benefit such action or proceeding is instituted, prosecuted or defended, to testify as a witness in his behalf, in the same manner and subject to the same rules as other witnesses, provided that the party so called to testify may be examined by the opposite party, under the rules applicable to the cross-examination of witnesses." The 7th section declares that "if a party, on being duly summoned, refuse to attend and testify, either in court or before any person authorized to take his deposition, besides being punished himself as for a contempt, his petition, answer or reply may be rejected, or a motion, if made by himself, overruled, or if made by the adverse party, sustained."

These provisions of our statute, which have been there since the revision of 1835, were probably designed as a substitute for the ancient chancery practice in regard to interrogatories appended to a bill, and had the same object in view, which was to give a party an opportunity to sift the conscience of his adversary. If the interrogatories were unheeded, the court of chancery regarded the party refusing to answer as in contempt; and our statute, on the failure of the parties summoned to appear and submit to examination as a witness, authorizes the court to reject his petition or answer or reply. It will be observed that the answer of Hatcher is not sworn to, nor was it necessary under our practice that it should have been.

There is, therefore, no proof in this case entitled to any weight, that Hatcher had the least knowledge of this farm, except that Balthorpe swears Hatcher had known it for twenty years.

Hatcher was a dealer in real estate, and, as he was said to be worth $70,000, had evidently been a successful one. Now, if Hatcher was acquainted with this tract of land and knew its value, he of course knew that $1,800 was a very inadequate price for it, as it was bought only a year before for near-

ly twice that sum; and the fact that it was offered so low would have induced him to inquire into the causes.

But if we assume the other hypothesis, that Hatcher was entirely ignorant of this tract of land, and was a successful dealer in real estate, then it is clear that his immediate acceptance of Balthorpe's proposal and his immediate transmission, through Balthorpe, of the $1,800 of purchase money, cannot easily be accounted for except on the ground that Balthorpe had communicated to him all the circumstances under which this farm was so suddenly put on the market.

There can be no doubt that Moore, the agent said to have been selected by him to buy, who was a near neighbor of Eck's, was fully acquainted with all the facts we have above recited. Why Moore was selected, instead of Balthorpe, to consummate this bargain, is difficult to be explained, seeing that Balthorpe was a family connection of Hatcher's, and lent $1,000 to him to make the purchase, without taking any note for it or any other security, and Balthorpe was a lawyer, competent to transact such business; and Moore was, as the evidence states, "an ignorant farmer;" and Balthorpe must undoubtedly have had the confidence of Hatcher, as Hatcher invested $1,800 on his representations, and borrowed $1,000 of him temporarily, to enable him to make this investment. Balthorpe was at Hatcher's house only one night, and the arrangements for the purchase were consummated that night, by Hatcher's borrowing $1,000 of Balthorpe, and sending by him this sum and $800 to Moore, authorizing Moore to buy.

The selection of Moore as agent, instead of Balthorpe, would seem to have been from the suggestion of the latter, who clearly saw that his notorious and recorded complicity with Mrs. Eck and Grandy, might give support to a like charge on Hatcher, if he (Balthorpe) was made Hatcher's agent.

There is no doubt that Hatcher had such information from Balthorpe as to put him on inquiry. If he knowingly allowed himself to be used to consummate the schemes of Balthorpe and Mrs. Eck and Grandy, he must abide the

consequences of such complicity. If he really was ignorant of these schemes, and ignorantly allowed himself to be used in this way, he must be charged with gross inattention to his own interests, and a disregard of all the ordinary rules of prudence.

He neglected to inform himself when the circumstances of the sale evidently required investigation and put him on inquiry. We do not, therefore, consider him as a purchaser without notice. There is no doubt, from the evidence, that the previous deeds to Eck's wife and to Graudy were fraudulently obtained, if obtained at all. Upon this point the evidence is clear. The testimony introduced by the defendant is mostly on the subject of Eck's sanity, about which people would of course differ. We have expressed our opinion on this point heretofore, and we consider it immaterial.

We think it entirely unnecessary to cite the authorities in relation to the chancery law, either of England or this country, on this question, although such authorities are extensively quoted in the brief of the counsel for plaintiff. The facts so clearly indicate a concerted fraud which succeeded in reducing the plaintiff in a short time from a condition of pecuniary independence, to one of absolute destitution and poverty, as to require no precedent to authorize the intervention of a court of equity. So far as the wife and son-in-law are concerned, there could be no hesitation, and the plea of want of notice, on the part of the defendant, Hatcher, not having the support of his own testimony, is too transparently flimsy to justify any hesitation or doubt on his account.

We shall, therefore, reverse the judgment of the Circuit Court, and this court will proceed to decree that all the deeds shall be canceled, and that the plaintiff is entitled to the possession of the premises in controversy, and that an appropriate writ issue for that purpose from the Circuit Court of Adair county; the other judges concur.