MABARY v. McCLURG *et al.*, *Appellants.*

74 575
98 201
74 575
39a 288

**Fraud: EVIDENCE.** Where the petition distinctly charges fraud upon a defendant, his unexplained failure to appear and testify to his own innocence will be regarded as a strong circumstance against him; and this whether he was subpœnaed by the opposite party or not. See *Baldwin v. Whitcomb*, 71 Mo. 651.

*Appeal from Hickory Circuit Court.* — HON. R. W. FYAN, Judge.

AFFIRMED.

This was a suit brought by the heirs of John Mabary, deceased, against Joseph W. McClurg, Marshall W. Johnson and E. B. Torbert, to set aside an allowance of $10,925 made by the county court of Hickory county sitting in probate, in 1865, in favor of E. B. Torbert & Co., a firm composed of the above named defendants, and against the estate of said Mabary, and to set aside and annul certain sales of real estate made to said McClurg under the orders of said court to pay said allowance. The claim allowed was for goods alleged to have been taken from the store of Torbert & Co. at Linn Creek in October, 1861, by a company of men known as the Mabary company, then supposed to have been acting under the orders of John Mabary. Upon the trial of the present case it was shown that the Mabary company was a company of Confederate soldiers, organized in Hickory county in May, 1861, by John Mabary; that he was captain of the company until August, 1861, when he resigned and his connection with the company ceased; that Charles Howard became captain in his place; that in the month of October, 1861, the company, with Howard in command, went to Linn Creek and took from the store of Torbert & Co. goods, consisting mainly of material for shirting and for uniforms, boots and shoes, gloves and hats, for which a quarter-master's receipt was given; that Mabary was not present and had no hand in taking the goods, and was in no way privy to it.

A mass of evidence was offered tending to show that the allowance was obtained either through fraud and collusion between Torbert & Co. and Jas. R. Wilson, at that time public administrator of Hickory county, and as such in charge of the Mabary estate, or else through intimidation practiced by Torbert & Co. upon Wilson. Issues were framed and submitted to a jury upon both these points. The jury found that there was no intimidation, but there was fraud, and the court adopting the finding, made a decree setting aside the allowance and all the sales and conveyances made by the administrator. The evidence bearing upon the question of fraud is here given at length:

Geo. W. Rains, one of the plaintiffs and son-in-law of John Mabary, deceased, testified: I was present when the claim of Torbert & Co. for $10,925 was allowed. Wilson, the public administrator, who was in charge of the estate of Mabary, had no counsel. Torbert & Co. had Mr. Sherwood. I heard part or all of the account presented read. It was for goods taken in 1861; goods were alleged to have been taken some time in August, 1861, in the account. It may have been later than August. Witnesses who testified were one Lieutenant Gray and Wm. Flesher. Gray testified that he was clerk in the firm of Torbert & Co. I was also a witness. I heard all the testimony on the trial of the cause. No one testified that Mabary was present at the time the goods were taken. I was at Linn Creek when the goods were taken. I was called as a witness in the county court. I testified. I did not know much. I was stopped in my testimony by Mr. Sherwood and was allowed to testify no more. Flesher testified that he found a sack or two of salt, a part of a keg of nails, a bolt or two of domestic. I had seen the salt and nails before myself. Flesher testified first I think. I knew where Mabary got the salt and nails. I think I was with him when he got the salt. I think he got it in Hermitage. I was going to testify to that fact when I was stopped. Wilson made no objections at all; did not ask me any questions at all;

made no objections to Flesher testifying. I cannot tell whether Wilson had any witness subpœnaed or not. He introduced no witnesses that I know of. He did not object to any being stopped, or remonstrate or insist on my giving my testimony. He asked Kidwell one question, and that was if he knew that to have been a rebel company that had him prisoner, and Kidwell said that was what they called it. Sherwood had previously asked Kidwell something about the Mabary company. Kidwell had said something about this company having had him a prisoner, and I inferred from his testimony that he had been a federal officer. The only witnesses who testified on the trial were myself, Flesher, Gray and Kidwell. We were introduced by Torbert & Co. I could not say that Mabary was not present at the time the goods were taken. The trial lasted two hours, or an hour and a half. Sherwood alone argued the case, and only argued a few minutes. Before the trial I told Wilson I wanted him to defend the case if he spent the estate at it. I do not know all that Gray testified to. I remember the question was asked Gray, who was in the command of the company that took the goods, and his answer was, it was a man by the name of Howard. Gray swore to something about that he did not know Mabary, but was told it was Mabary's company.

Cross-examined, this witness further said: I was subpœnaed by Torbert & Co. I suppose I heard all the testimony of Gray. He stated that he was at Linn Creek when the goods were taken, and that some one stated that it was the Mabary company. I do not remember that Gray stated that Mabary was up in the upper town. Gray also stated that a portion of the goods taken were of the class of goods charged for in the account. Don't remember about Flesher testifying to any goods found, only about some goods afterward found up stairs in Mabary's house, and that these goods were found about two weeks after the goods were taken at Linn Creek. There was something asked me about some kind of dark check cloth; I told

them I had seen some of the Mabary boys wear such cloth, and some others, between August and December, 1861. I was home the biggest part of the time in the fall of 1861. I do not know of the defendants Johnson, McClurg or Torbert being here in town on the day of trial. If they were, I did not know it. I did not talk much with Wilson. The language I used to him was, I told him that I had been told to tell him for him to defend the suit if it took it all, and he said he thought it of but little use. I think Sherwood asked me about some certain goods I mentioned while ago. Yes, he asked me some other questions about goods, and something was said about what Flesher had testified to ; asked me whether I had seen such goods as Flesher testified to, and I said I did, and he asked me where they came from, and I was going to tell and Sherwood stopped me. I cannot tell the sentence he stopped me at. I am certain he stopped me on the sentence I was going to tell. I am not certain he stopped me from answering the question. I can't say that I can remember much as to what Kidwell testified to, only that he was captured by the Mabary company. I can't say that Sherwood knew what I was going to testify to, when he stopped me. I believe he stopped me in answering the question he had asked. Wilson did not say anything about appealing the case to the circuit court.

Charles Kroff, a witness for plaintiff, testified that the order of sale of the Hickory county court was in part in the handwriting of Mr. Sherwood, and in part in the handwriting of M. W. Johnson, a member of the firm of Torbert & Co.; that Wilson's report of sale and affidavit thereto were altogether in Johnson's handwriting; that the affidavit of the appraisers of Mabary's real estate was in Sherwood's handwriting; that witness was himself one of the appraisers, and at the same time was attorney for Johnson and McClurg, employed by the year, but the Mabary case was excepted from the employment; that the appraisers made the appraisement without going on or near the-

land. Witness then testified as to certain other probate papers in the case that they were in the handwriting of Sherwood, Johnson and himself, and proceeded: Wilson told me about what was testified to before the probate court, in 1865, about the goods being taken by Mabary's company. I said it was inadmissible. He said he was no lawyer. He told me there was no evidence in the court below that Mabary was there at the time the goods were taken. He said the lieutenant of the company said the goods were taken by order of Captain Mabary. I told Wilson the evidence should not have been admitted unless a conspiracy was shown between Mabary and the lieutenant. I spoke to Wilson about setting the judgment aside. He replied that he did not think it could be done, that it was just and ought to stand. In the fall of 1867 a motion was made by Kenton for the Mabary heirs to have the judgment set aside. I do not know that Wilson opposed the motion. At the hearing of the motion Kenton appeared for the heirs, and not the administrator. About the time of the hearing of the motion Wilson expressed himself in favor of having the judgment stand and against having it set aside. The merits of this motion were never tried; dismissed for want of service. I don't know who requested me to act as appraiser in the case. It was before the motion was filed by Kenton to set aside the judgment that I had the conversation with Wilson.

On cross-examination the witness testified: Col. Johnson has had charge of the management of this case for the firm. McClurg was here once at court about two years ago. I was pretty well acquainted with all the lands described in this appraisement. I don't think any one was present when we appraised them. Wilson, the administrator, presented to me the affidavit of appraisement and the list of lands and the certificate made out, and we put in the amount. The appraisement, I think, was made in my office, or it may have been made in the probate office. We fixed the amount at which the land was appraised

on our own judgment. Don't think Col. Johnson or the administrator were present when the appraisement was made. The report of sale, 1869, is partly in my handwriting. I went to Dallas county for the administrator, and at his request got the appraisers and had the land then appraised and made out the report of the sale. I had no consultation with Col. Johnson or any other person as to how much the Dallas county land should be appraised at. I did not suggest to the appraisers any amount. They fixed it at $400, themselves. I have frequently seen attorneys make entries on the record in both probate and circuit court. I know nothing about Torbert. McClurg and Johnson reside at Linn Creek, about forty-five miles from here. I think the conversation I had with Wilson was in 1867 I do not know of any combination or collusion between Wilson and the defendants. Wilson said he did not think the judgment could be set aside, that the claim was just, that Mabary was there, and the judgment ought to stand. He said there was no evidence that Mabary was there. The evidence was that the Mabary company was there; there was no doubt about that. Wilson said the lieutenant said at Linn Creek that Mabary was at the upper town, and that goods were being taken by his order, or that they were acting under his orders. He said Flesher and Kidwell testified that a large amount of goods had been found next to the bed-cords at Mabary's house. When my deposition was taken there were other witnesses examined and appeared for the defendants. No one cross-examined me.

H. H. McKee, a witness for plaintiffs, testified: After the allowance was made against Mabary's estate I heard Wilson say he thought the claim was just. He said he did not believe Mabary was there when the goods were taken, but his company was there, and that made him (Mabary) responsible, equally guilty. He and I had frequent conversations about this estate. He seemed to be sorry that the Mabary heirs had lost their land, but "it did not

make much difference, dog on them, they were all rebels, and the rebels had ruined the country, and it was no difference if the rebels did lose their land, and they ought to lose it." Wilson said in 1867 there was no evidence before the court at the time of the trial in 1865 that Mabary was at Linn Creek at the time the goods were taken, but that Torbert & Co. ought to have pay for the goods. At the sale I think Col. Marshall Johnson bid the land off. Wilson told me that he had consulted with Sherwood with regard to the setting aside of this judgment, that Sherwood said it could not be or ought not to be set aside, that he thought Sherwood a good lawyer. He seemed to have great confidence in Sherwood.

On cross-examination the witness said : Wilson said Flesher testified goods were found in Mabary's house : don't remember as to amount of goods so found, or that the goods were concealed. He said by Mabary's company being there it made John Mabary accessory, but that Mabary was not there himself; but he was liable because his company was there ; that made him equally liable for taking the goods. He seemed to believe that Mabary was liable for taking the goods. I think he was aiming to get my opinion as to whether the judgment could be set aside. He said Sherwood told him the judgment could not or ought not to be set aside. I understood from Wilson that he had counseled with Sherwood about setting aside the judgment. I thought from what he said he had got Sherwood's opinion about it, and that seemed to control him.

Geo. Mabary, son of John Mabary, deceased, testified : When I got home from the war in 1863, in August or September, I went to see Wilson. I asked him if he defended the suit, and he said he had. I asked him if he had employed an attorney. He said he had not. I told him he ought to have done so. He said he expected he ought to, but had not done so. I told him he had not done his duty. He replied that he thought he had. He said : "I will tell you the fact. I could not. The condition of the

country was such that my life was in danger. I could only work on one side." He told me all the land had been sold. I then asked if certain pieces was sold—the old home place, and he said it was. I then asked him if the other place was sold. He said it was. I then asked him about the land in Dallas county, and he claimed we had no land in Dallas county. I told him we had, and told him where it was. He then said he would look after it. I then asked him if they could move the judgment here in Dallas county, and he said it could. I then told him if they made any attempt to sell the land in Dallas county to let me know it. He said he would, but never done it. We never said anything to him about the judgment after the first conversation. Wilson did not name any person who he was afraid would take his life, did not mention the defendants. He referred only to the general condition of the country.

Wm. J. Mabary, a son of John Mabary, deceased, testi-fied: In February, 1866, I came to Hickory county, and told Wilson I thought he had done strange; that I sent him word to let me know if necessary to employ counsel; that I did not think he had done his duty. Wilson said: "It is a hard case. Public opinion ran so high a man was in danger to transact any business of the kind as it should be done. You know where Col. McClurg has been." I told him I knew he had been on the Federal side all the time. He said, that's what's the matter. He said there was no use of trying to defend anything that belonged to the opposite party. I told him he professed to be a Union man all the time, and ought to have something to say as to his business. He replied, it was all just one way; there is no chance. He said he thought if it could be got at right it would not be hard to set the judgment aside; that he had been talking to Kroff, and that was his opinion.

Wm. Dollarhide testified: I was one of the appraisers, and put the lands at what I thought they were:

actually worth, without any suggestions as to valuation on the part either of the defendants or their attorney.

Thomas E. Gray testified: I was present when the claim of Torbert & Co. against the Mabary estate was allowed; testified as a witness for the plaintiffs. The claim was for damages for the taking of the goods of Torbert & Co. on the occasion of a raid or raids made on Linn Creek. I testified that the goods had been taken; that some of the men, when the goods were taken, had stated that they belonged to the Mabary company; also, to the amount and value of the goods. I do not now remember all of my testimony; know that I did not testify that to my personal knowledge John Mabary was present or took part in the taking of the goods, for I did not know him. If I said anything about his being there, it was what some one of the company had told me, and not of my own personal knowledge. I don't remember what class of goods were taken. They took some piece goods for uniforms. The evidence produced by the plaintiffs, or at least my testimony, was with regard to the company being at Linn Creek when the goods were taken, and not in regard to Mabary personally being there at the time.

I was a witness for Torbert & Co. in a case in which they were plaintiffs and some parties, I do not remember their names, defendants, which went on a change of venue from Hickory to Pettis county, in which Torbert & Co. claimed damages to the amount of $30,000. That suit was for damages for the taking of the goods of the firm upon the raid or raids I have named. When these raids were made, parties came from all directions—from Polk, Greene, Dallas, Laclede, Hickory, Wright and Webster counties, and took goods and hauled them away, and on account of this suits were brought by Torbert & Co. against many influential men, and those who had property in these counties who were known to be rebel sympathizers. When these raids were made I was one of the parties left by Torbert & Co. to see what goods were taken and who took

them.   The firm afterward sued a good many men whom I had no knowledge of being there at the time the goods were taken.

Wm. F. Bradley testified :   I was clerk of the county court of Hickory county in August, 1865; was present when the claim of Torbert & Co. was allowed.   My recollection is, that a man by the name of Gray testified on their behalf.   He made about this statement:   That the claim was for goods of different kinds, groceries, salt, and I am not sure if there was coffee and sugar, boots, shoes, clothing, hats and caps; that they had been taken by a company of men who said they were Captain Mabary's men, and that they took the goods by the authority or order of Captain Mabary; and, as far as I recollect it, that Captain Mabary was not there that day, or he did not see him ; and that Captain Mabary's company was at that time camped about a mile from town.   If Wilson made any defense, I do not recollect it.   I do not recollect that he made any objections to the admitting of the testimony of Gray.   If he made any, it has escaped my memory.   If he had any attorney employed, I do not recollect it.   He did not introduce any witnesses that I recollect.   If he introduced any, it has escaped my recollection.   I have no recollection that there was any testimony that John Mabary was present when the goods were taken.   I am not certain about this; but if I was to give my honest impression, I would say there was none.   To the best of my recollection there was no witness but Gray.   If Wm. Flesher was there, I do not recollect it.   I do not pretend to give all the evidence that was given there that day, except Gray's.   I do not recollect any other witness testifying.

M. W. Johnson, one of the defendants, testified:   I was at our store at Linn Creek in the fall of 1861, when the robbing of it was commenced; was there when the first gang came early in September.   It came in the afternoon, took us all prisoners, took possession of the store, and left next day, taking what goods they wanted.   Some-

thing like a week after this the robbers came again. When we heard they were at upper town, a little less than a mile away, I left and went to Decaturville, fifteen miles south, where I understood a home guard company was stationed, to get them to come and assist us in our defense. The company I sought had gone to Miller county, and I followed on. I was not at our store any more till about the 10th of October following. Was on the opposite side of the river from it in sight at least twice while robbery was progressing. Saw the rebel pickets and armed parties operating about the store. Torbert had charge in my absence; McClurg was in Jefferson City. Our stock of goods at the commencement of the robbery would amount, I suppose, to $150,000 or $175,000 worth. We had a general stock of merchandise, everything in that line ordinarily sold in the country When I returned to the store I found not exceeding $20,000 worth of goods, and these in a confused and damaged condition. I had the exclusive charge of the collection of accounts and settlement of business. Judge Sherwood was our sole attorney in procuring the allowance of the account against the Mabary estate; he was entrusted with the whole management and collection of the demand. I had never seen Wilson and never corresponded with him up to the time of the allowance; had no acquaintance with him whatever; first saw him at the time of the first sale in May, 1866, and up to this time no member of the firm had been here, and none of the firm have ever been here save Gov. McClurg, who was here about two years since as a witness. I cannot tell the precise date when I was here the second time; at the second sale I was not here; sent one Lankford; was here at the time that writing was made, referred to in the record; am in the habit of doing writing of that character; making reports of sales, deeds, etc.; don't remember just why I wrote the numbers of the land on the record, unless it was in order to get the description of the lands correct, I being familiar with the numbers. Whatever I did in this respect was done under

the supervision of the probate judge; often made out reports for administrators, if they were poor scribes and I was interested in the lands sold; did nothing in this matter but what I thought it was my right and duty to do as a faithful agent of the parties I represented. The appraisers were not appointed at my suggestion or solicitation. I knew none of them, except perhaps Wm. Dollarhide. I never had any conversation with Wilson, or either of the appraisers, as to what the land should be appraised at. Neither Kroff, Wilson nor McKee was appointed at my suggestion. No threats were at any time made by myself or any other person for me to deter Wilson from making a defense to the suit. I never thought of such a thing. There was no collusion or combination between myself and Wilson or any one else to procure allowance of the demand. The amount realized by the firm from all sources out of the stock of goods taken at Linn Creek. was $10,600, and the cost of procuring that amount has been at least $3,000.

The information upon which I acted in causing the demand of $10,925 to be presented for allowance was, that Mabary's company had taken a portion of the goods, and that he was along at the time; that it was by his order the goods were taken and he was captain of the company; that the same kind of goods were found at his house shortly after the store was robbed; that these goods were made up into uniforms at Mabary's house, and that Mrs. Mabary, when the goods were found at her house, declared that they were old McClurg's goods, and that they ought, to be taken. These representations were made to me by Gray, Brusche, Kidwell, Torbert and Flesher, prior to the allowance. They were reputable men. I had every reason to rely upon them, and did in good faith rely upon them, and was never informed by any person that Mabary was not present at the time of the taking until some years after the allowance. About the time the Kenton motion was filed I received the first intimation of it. I think I

made out the account that was presented in the probate court. It was for various articles of merchandise; do not recollect that Wilson ever told me that certain lands belonging to the estate had not been sold My information prior to the presentation of this demand was that all parties engaged in the wrongful taking of the goods were each liable for the whole amount, but the firm was entitled to but one satisfaction. I had been so informed by different attorneys—Lindenbower, Sherwood, Young and others. From the manner in which the goods were taken, and the kind of goods, it was impossible to single out each item that each individual got and sue him for that particular amount. I was informed that the taking of the goods. was nearly continuous from the time of its commencement to its close.

On cross-examination, Johnson said: I first learned that Mabary had resigned at the time the goods were taken, after Kenton's motion to set aside the allowance was filed, which was in 1867. Gray told me what he would testify to before he came. McClurg commanded the 8th Missouri State Militia. Flesher was one of the squad of men who went to Mabary's house. I knew Mabary owned some property before we commenced suit. We knew he was worth suing. I made out the account from the goods. we lost, and that we supposed had been taken by Mabary and others; made out a number of accounts against various parties. The gross amount of accounts might have amounted to $200,000. I don't know that I took any particular pains to ascertain what goods Mabary had taken; I did not know what goods he or his company had taken when I made out the account. I made affidavit to the Mabary account; gave the account to Sherwood; sent the witnesses from Lebanon to testify in the Mabary case; received a notice of the filing of the Kenton motion to set. aside the judgment; testified in this court a year ago that. I had no information that Mabary was at the store or present there when the goods were taken, but that he was with.

a part of the company at the upper town. Sherwood, when here, was acting under our direction and authority. He had full authority to do as he saw fit in this claim, and so far as I know, either by personal knowledge or information, I indorse all that was done by him in the management and collection of this claim. I don't know what we did have Mabary charged with; think his account was made out on half sheet letter paper; think we had him charged with about one dozen articles; don't know what they took. We brought a suit in Greene county for $50,-000. There are items in the Pettis county claim that were in the Mabary claim and the Laclede and Greene county claims. I swore to them all. Items the same in each account.

James R. Wilson, for defendant, testified : I was public administrator of Hickory county, and had charge of the estate of John Mabary, deceased, and waived notice of the presentation of a demand of the firm of McClurg & Co. against said estate. My recollection is this suit was continued by consent of plaintiff at my request; the delay on my part was to enable me to find evidence to defeat the claim of plaintiffs. I applied to the members of the Mabary family personally and by letter for evidence to show that Mabary was not at Linn Creek when the goods were taken, or that he did not afterward have the goods in his possession. I could not obtain such testimony. The family of Mabary did not give me the names of any witnesses to enable me to make a defense; nor could I obtain any. I defended the estate as well as I could. The testimony was to the effect that the goods were taken by the Mabary company by the direction of Mabary, and that similar goods were shortly afterward found at his house. I did not take an appeal because I could find no evidence to defeat the claim. About twelve or eighteen months after the demand was allowed, I consulted one of the heirs about an appeal. No member of the firm of Torbert & Co. was present at the time the demand was allowed. There was

no request made by Sherwood, or any one else, that I should show any favor to Torbert & Co. Nor did I show them any favor, unless waiving the necessity of notice was such favor, and the waiving of notice was a course usually pursued by me in order to save costs of service. I declare that I sought to obtain evidence to make a successful defense against said demand, but could not find any testimony, and these claimants were treated by me like all other claimants. I declare that the charge that there was any collusion between myself and Sherwood or the claimants is wholly and utterly false.

Thomas A. Sherwood, for defendant, testified: Neither McClurg nor any one else representing the firm was present either when notice was waived or when the claim was allowed, but myself. Evidence was given tending to support the claim. Among other facts proven was that Mabary's company, of which he was captain, came to Linn Creek and took a large amount of goods from McClurg's store, the lieutenant of the company stating at the time that his captain—Mabary—was at the upper town. My recollection is further, that similar goods to those taken by the company were shortly afterward discovered in considerable quantities at Mabary's dwelling. There was not, to my knowledge, any fraud or collusion used in the allowance of that claim, nor did I have the least reason to suspect any fraud.

E. B. Torbert, for defendant, testified: I was a member of the firm of Torbert & Co. in 1861. The Mabary company, armed, came to the store and demanded the goods. I refused, and they proceeded to help themselves, saying they were sent by Captain Mabary, and were acting under his orders. At that time Mabary was at the camp with the rest of the men. From the first to the last it was a robbery, and we were entirely unable to resist it. I made no arrangement with any officer for the taking of any of these goods. I was simply helpless in their hands.

Wm. H. Liggett, for defendant, testified: I am judge

of the probate court of Hickory county, and was clerk and present at the time of the allowance of the claim of Torbert & Co. against the estate of John Mabary, in August, 1865; remember part of the testimony; don't remember of Rains being sworn; have been probate judge since 1867; have been present at all the probate courts; know of no collusion between Wilson, administrator, and these defendants or their attorney, nor any intimidation to prevent Wilson from making all proper defense; have some recollection that Wilson questioned the witnesses.

Wm. Flesher, testified: I went to the house of Mabary in the fall of 1861, and found goods there, domestics, salt, kegs of nails and hats. The said goods were up stairs; also domestics on the cords of the beds under the ticks. There was quite a lot of goods in the house. I did not see John Mabary at the time. This was about two weeks after the goods had been taken from Torbert & Co. At the time I testified in the probate court I did not state, and do not know of my personal knowledge, that the goods found at Mabary's house were the goods of said firm. I heard Thos. Gray's testimony before the probate court. He testified that Mabary took the goods of Torbert & Co., and commanded his men to take the same.

John N. Mabary, Geo. W. Mabary and Geo. W. Rains testified that they never received any letter from Wilson about defending the claim of Torbert & Co.

*Smith & Krauthoff* and *Wallace & Nixon* for appellants.

*Smith, Nesbit & Ferguson* for respondents.

HENRY, J.—In 1865 the defendants presented an account, and obtained an allowance, against the estate of John Mabary, deceased, for $10,925, in the county court of Hickory county, and, to satisfy the same, the administrator of said estate, Jas. R. Wilson, procured an order for the sale of lands belonging to said estate, and sold them at

private sale to the defendant McClurg. This suit was instituted by the heirs at law of said John Mabary to set aside said judgment and sale for fraud in procuring them, and the petition alleges that the administrator confederated with defendants to cheat and defraud the estate, the latter by procuring and the former by permitting, without resistance, the allowance of the demand, which they all knew to be unfounded. The fraud is circumstantially stated in the petition. There was a trial of the issues by a jury, which resulted in a verdict and judgment for plaintiffs, from which defendants have appealed.

There was abundant evidence tending to establish the fraud. The administrator testified to the contrary, but it is impossible to reconcile his testimony with his conduct. The claim was for an amount exceeding the value of the entire estate, and the administrator was urged by heirs of the intestate to spare no expense in contesting it; yet he employed no attorney, introduced no testimony, and even failed to cross-examine a witness introduced for plaintiffs, who now testifies that, if interrogated, he would have testified to facts exonerating the intestate from any participation in the alleged robbery of plaintiffs' store at Linn Creek. The evidence warranted the verdict of the jury, but if it were more evenly balanced, we would not be inclined to disturb the finding, inasmuch as the jury and the court had the witnesses before them, and were far more competent than this court to determine the degree of credit to which the witnesses respectively were entitled.

One fact is worthy of note: Two of the defendants testified in the cause. The other, McClurg, was neither a witness nor present at the trial. In *Eck v. Hatcher*, 58 Mo. 239, the fact that Hatcher, who was charged with having purchased land of which Eck had been defrauded, with knowledge of the fraud, failed to appear and testify when summoned as a witness for plaintiff, was regarded as a strong circumstance against him. *Henderson v. Henderson*, 55 Mo. 534; *Cass Co. v. Green*, 66 Mo. 498. And although

McClurg was not summoned as a witness by the other side, he was a competent witness and could have appeared and testified in his own behalf.   Johnson and Torbert, his co-defendants, who had no interest in the land purchased by McClurg, at least were not known in the purchase, were called as witnesses for the defense, and this makes the silence of McClurg more conspicuous and significant.   We would not go outside of this record to cast any imputation upon McClurg.   It may be, and from his reputation for integrity we would be inclined to believe, that he had reasons for not appearing as a witness on the trial, which would utterly destroy the inference to be drawn from his silence; but while we neither can nor would travel out of the record to find matter of accusation against McClurg, neither can we for matter of exculpation. .If innocent of the charges against him, it is to be regretted that he did not appear at the trial, and on his oath aver that innocence. Judge SHERWOOD having been of counsel in the county court did not sit in this case.   All the other judges concur in affirming the judgment

*Motion for rehearing overruled.*