## TAAFFE v. KELLEY, *Appellant.*

### Division One, May 23, 1892.

1. **Fraudulent Deed, Action to Set Aside:** ESTOPPEL. Where one R. fraudulently made a conveyance of land not his own, his grantee cannot in an action by the real owner to set aside such deed successfully set up as a defense by way of estoppel the fact that plaintiff had instituted criminal proceedings against R.

2. ————: ————. Where R. had been an employe of plaintiff who for business purposes had been in the habit of making deeds for lands purchased by him to R., and the title to the land fraudulently conveyed was according to the records in R., but there was no evidence that defendant was induced to act on any knowledge of plaintiff's peculiar business methods, such mode of business will constitute no defense

3. ————: NOTICE OF PRIOR DEED. Notice is actual when the purchaser either knows of the existence of the adverse claim or title, or is conscious of having the means of knowing, although he may not use them.

*Appeal from St. Louis City Circuit Court.*—HON. JACOB KLEIN, Judge.

AFFIRMED.

*John J. McCann* for appellant.

(1) In the interests of public policy, the policy of the registration laws, and the policy of the criminal laws, plaintiff ought not to be permitted to gainsay that Roberts was the owner of the property in controversy. Malone on Real Property Trials, pp. 436, 439, 440, *et seq.;* Bingham on Real Property Actions & Defenses, p. 352; 2 Bigelow on Fraud, p. 511, quoting 27 Eliz. Ch. 4; 2 R. S., pp. 1252, 1253; 1 Parsons on Contracts, secs. 40, 43; 2 Sugden on Vendors, p. 702 (431), p. 702 (435); 2 Story on Equity Jurisprudence, sec. 1201*b; Kennedy v. Kennedy,* 57 Mo. 78; *Ringo v. Richardson,* 53 Mo. 385. (2) If, notwithstanding plaintiff can be

allowed as a professional dealer in real estate to assume one attitude in public and a different one in private, imperiling all other persons who may have occasion to deal with the properties claimed by him, and he can also show an unaffected and unembarrassed exclusive title in himself to the property in controversy, yet the evidence is not such as ought to warrant a court of equity in charging any notice on defendant Kelley.  *Fellows v. Wise*, 49 Mo. 350; s. c., 55 Mo. 413; *Musick v. Barney*, 49 Mo. 405; *Stevens v. Hampton*, 46 Mo. 405; *Maupin v. Emmons*, 47 Mo. 305; *Vaughan v. Tracy*, 25 Mo. 218; s. c., 22 Mo. 415; *Beattie v. Butler*, 21 Mo. 313; *Kearney v. Vaughan*, 50 Mo. 284; *Muldrow v. Robinson*, 58 Mo. 331; *Eck v. Hatcher*, 58 Mo. 235; *Roberts v. Mosely*, 34 Mo. 507; *Cornet v. Bertelsman*, 61 Mo. 118; *Draper v. Bryson*, 26 Mo. 108; s. c., 17 Mo. 74; *Speck v. Riggin*, 40 Mo. 405; *Williams v. Tutt*, 85 Mo. 475.  (3) If the court should nevertheless find that there is some sort of notice to defendant Kelley, yet it cannot be concluded that it was of a sufficiently definite, clear and distinct character as to put him on inquiry.  Bingham's Real Property Actions & Defenses, 355, 356; *Hine v. Dodd*, 2 Atk. 275; *Ford v. Bunch*, 6 Barb. 60; *Rogers v. Wiley*, 14 Ill. 65; *Smith v. Yule*, 31 Cal. 183; *Pittman v. Solfey*, 64 Ill. 155; *Massie v. Greenhow*, 2 Patt. & H. 255; *Chicago v. Witt*, 75 Ill. 211.  (4) If the justice and equity of plaintiff is entirely unclouded, and defendant Kelley had the degree and character of notice to put him on inquiry, his entire duty was fully performed when he found the record of the Roberts deed as owner to plaintiff as trustee, and he then had a perfect moral and legal right to ignore any and every oral statement, hint or innuendo that came to him to the effect that Roberts was trustee and plaintiff owner.  1 Story on Equity Jurisprudence, sec. 400c; *Jones v. Williams*, 24 Beav. 47; *Jones v. Smith*,

1 Hare, 45; *Plumb v. Truitt*, 2 Anst. 433, 440; *Dey v. Dunham*, 2 Johns. Ch. 190, 191; Sugden on Vendors, ch. 17; *Wildgrove v. Wayland*, Godb. 147; *Jolland v. Stainbridge*, 3 Ves. 478. (5) If defendant Kelley, notwithstanding, had no right to depend on the Roberts (as owner) deed to Taaffe as trustee, and bought the property in controversy wrongfully, the acts of plaintiff following the sale to defendant Kelley invested him, defendant Kelley, with a new equity and divested plaintiff of his asserted character as owner of the property. *Bank v. Morgan*, 117 U. S. 96; *Cooke v. United States*, 91 U. S. 396; *Anderson v. McPike*, 86 Mo. 298; *Austin v. Loring*, 63 Mo. 19; *Chouteau v. Goddin*, 39 Mo. 229; *Campbell v. Johnson*, 44 Mo. 247; *Knight v. Tiffin*, 5 Q. B. (6) If it be concluded that Kelley had actual notice of the condition of the title, it must be also concluded that he bought a better title from Roberts than plaintiff could have given; or in other words that in justice and equity Roberts was, as he stated often before the screws were put to him, himself the owner of the property. *Fox v. Hall*, 74 Mo. 315; *Crow v. Drace*, 61 Mo. 227; 1 Story on Equity Jurisprudence, sec. 188; *Roberts v. Mosely*, 64 Mo. 507; *Roberts v. Mosely*, 51 Mo. 282; Perry on Trusts, sec. 443, note; *Udell Case*, 8 Ill. 527. (7) It ought not to be permitted only as against himself, and not as against defendant Kelley, to Roberts to impeach his own title of September 5, 1888, and it ought not to be permitted for him to voluntarily controvert his own pleading to the detriment of defendant Kelley. 1 R. S., secs. 675, 692; Greenleaf on Evidence, sec. 281.

*C. P. & J. D. Johnson* for respondent.

(1) The appellant had actual notice of the prior unrecorded deed from Roberts to Taaffe for the Jeffer-

son avenue and Pine street property, at the time he received the deed from Roberts to himself; hence, he took subject to Mr. Taaffe's title. R. S. 1879, secs. 691–3; R. S. 1889, secs. 2418–20; *Vaughan v. Tracy,* 22 Mo. 415; *Speck v. Riggin,* 40 Mo. 405; *Maupin v. Emmons,* 47 Mo. 304; *Musick v. Barney,* 49 Mo. 458; *Foster v. Holbert,* 55 Mo. 23; *Hopkins v. Sievert,* 58 Mo. 201; *Eck v. Hatcher,* 58 Mo. 235; *Muldrow v. Robinson,* 58 Mo. 350; *Baldwin v. Whitcomb,* 71 Mo. 659; *Massey v. Young,* 73 Mo. 273; *Houts v. Shepherd,* 79 Mo. 147; *Meier v. Blume,* 80 Mo. 184; *Sensenderfer v. Kemp,* 83 Mo. 581; *Mason v. Black,* 87 Mo. 342, and cases cited; *Hoge v. Hubb,* 94 Mo. 503; *Benne v. Schnecko,* 100 Mo. 256; 2 Pomeroy on Equity Jurisprudence, sec. 597; Bump on Fraudulent Conveyances [2 Ed.] pp. 50, 52. (2) Plaintiff was not estopped from asserting his title against appellant.

BRACE, J.—This is an action instituted in the St. Louis circuit court against Michael J. Kelley and Joseph Roberts to set aside and cancel a deed in fee from said Roberts to the said defendant Kelley, dated September 5, 1888, and filed for record September 6, 1888, at 4:54 P. M., to a lot of ground in block 922 on the corner of Jefferson avenue and Pine street, in the city of St. Louis, of which plaintiff was the owner, on the ground of fraud.

At the same time and in the same court, and on the same ground, another suit, in which Peter Taaffe and Thomas E. Gay as copartners were plaintiffs, was instituted against the same defendants and one Henry Klinger to set aside a deed of trust of the same date, executed by the said Roberts to the said Klinger as trustee for said Kelley to a lot of ground on Channing avenue and Chestnut street in said city, and filed for

record on the sixth of September, 1888, at 12:21 P. M., of which the said Taaffe & Gay were the owners.

The two conveyances were parts of the same transaction, and the two cases were tried together; judgment in each was rendered for the plaintiffs respectively, from which Kelley alone appeals. His answer was a general denial and a plea of estoppel. After the appeal was taken Peter Taaffe died, and his heirs have been substituted here as plaintiffs.

It appears from the evidence that for several years prior to the summer of 1888 Peter Taaffe and Thomas E. Gay were partners doing business as real-estate dealers in the city of St. Louis under the firm-name of Taaffe & Gay; that they had in their office, in their employ, the said Joseph Roberts, who was a half brother of Mr. Gay, not particularly bright, nor of the most exemplary habits; that from time to time both the firm and Mr. Taaffe individually made purchases of real estate, and for business purposes had deeds therefor made to the said Roberts who held the title for them, and made conveyances thereof as he was directed by his employers; that among the property thus conveyed to Roberts was the Jefferson avenue and Pine street lot, purchased by Mr. Taaffe and conveyed to Roberts by deed dated May 10, and recorded in the recorder's office on May 13, 1886; and the Channing avenue and Chestnut street lot purchased by the firm of Taaffe & Gay, and conveyed to Roberts by deed dated October 1, and recorded October 13, 1887. Afterwards, and in pursuance of this arrangement, Roberts, on the twenty-second of September, 1887, executed and delivered a deed for the Jefferson avenue and Pine street lot and other lots standing in his name, and belonging to the said Taaffe, and on May 1, 1888, he executed and delivered to Taaffe & Gay a deed for the Channing avenue and Chestnut street lot and other lots then

standing in his name belonging to them. These deeds were deposited in the safe of Taaffe & Gay, and were not filed for record until the seventh day of September, 1888, one day after the conveyances from Roberts to Kelley and from Roberts to Kelley's trustee.

Prior to the year 1886, one Henry J. Dockery also had been in the employ of Taaffe & Gay, was acquainted with their mode of doing business in the name of his coemploye, Roberts, and at the time of the transaction in question knew that Taaffe and Taaffe & Gay were the real owners of this property, and that Roberts had no real interest in the same. After leaving the employe of Taaffe & Gay, he seems to have served at times others in the same line of business, and finally in the summer of 1888 appears in the evidence as a sort of curbstone broker in real estate; impecunious and unscrupulous and a *habitue* of the saloon kept by the defendant Kelley, an old acquaintance of his, who at the time was the owner of an equity of redemption in some real-estate on Itaska street in said city of uncertain, if any, value—the property being worth about $2,000—and with some other property incumbered by liens amounting to about $3,300.

In the latter part of the summer of 1888, during the absence of Mr. Taaffe from the city on his usual summer "outing," the dissipated habits of Roberts became of such a character that he was discharged from the office of Taaffe & Gay, turned out of the home of his relatives and sought shelter with his *quondam* associate and coemploye, Dockery, and thereafter daily supplied with liquor at Kelley's saloon; he seems to have become Dockery's pliant tool, moving at his will and pleasure in the negotiations which resulted in the execution by him of the two deeds dated September 5, 1888, one to Kelley, and one to Kelley's trustee, in which negotiations Roberts was made to pose as a large landed pro-

prietor—Dockery as broker—and Kelley as innocent purchaser. These negotiations seem to have commenced about three weeks before the trade was finally consummated, during which time Dockery busied himself in ascertaining just how [the property stood on the records, Kelley at his stand in attending to his business there, and in inspecting and posting himself as to the value of the several pieces of property appearing on the records in Roberts' name, and the condition of the record title as to incumbrances, etc., and Roberts in "taking drinks" at Kelley's saloon, and in "blowing 'in" some money received during the negotiations from Kelley, and characterized as earnest · money in the trade—and which with drinks charged to him amounted in the wind-up to $80.

The evidence tends to show that the Channing avenue and Chestnut street property was unincumbered and worth about $75,000, and that the Jefferson avenue and Pine street property was worth about $3,000 over and above the incumbrances thereon. The terms finally agreed upon between the parties, on or about the fifth of September, 1888, were that Kelley was to lend Roberts $5,000 on the Channing avenue and Chestnut street property; and make him a deed to his (Kelley's) Itaska street property, and pay Roberts $1,000 for the Jefferson avenue and Pine street property. Accordingly on that day there was drawn, signed and acknowledged by Kelley a warranty deed conveying to Roberts the Itaska street property, and a warranty deed by Roberts, conveying to Kelley the Jefferson avenue and Pine street property, and a deed of trust by Roberts conveying to the said Klinger the Channing avenue and Chestnut street property in trust to secure the payment of a principal note for $5,000 payable one year after date, and two interest notes of $175 each, one payable in six and the other in twelve months. On the same day,

Kelley, who had no money to lend or with which to buy real estate, borrowed $900 of Mr. Klinger, and everything being thus prepared the parties met next morning at Dockery's room, Kelley with his deed and a bundle of money claimed to be $920, but which proved to be only $900, and the due bills of Roberts amounting to $80. The money was counted, and with the due bills and Kelley's deed was passed by him to Roberts, who then delivered to Kelley his (Roberts') deed to the Jefferson avenue and Pine street property. This part of the deal being thus closed, Roberts handed the money to Dockery, who passed it to Kelley, who again paid it to Roberts, who then passed it to Dockery, who again passed it to Kelley, who again paid it to Roberts, and thus it continued to go around the circle five times in succession, after being paid to Roberts the first time. After the money had reached Roberts the sixth time the deed of trust and notes were delivered to Kelley, and the second part of the deal was closed, but to clinch matters, and make everything clear and certain, an order was drawn, signed by Roberts and delivered to Kelley for the rents of the property, and the following receipt:

"Received, St. Louis, September 6, 1888, from Michael J. Kelley, $6,000 for the deed of trust on the lands in city block 1951, northeast corner of Channing avenue and Chestnut street, and balance due from trade of property at the southeast corner of Jefferson avenue and Pine street.

"(Signed)                    JOSEPH ROBERTS."

The deeds were filed in the recorder's office on the afternoon of that day with a request for "immediate" record, and that the transaction be kept out of the papers. After which Dockery having received $150 of the money from Roberts, and both being seized with an urgent desire to go West, in company with Kelley they

went to the Union depot, purchased tickets for Denver and left the city, Kelley returning to his place of business. Mr. Taaffe returned to his home in the city sick, on the night of 'the fifth of September, was first informed of the filing of these deeds of Roberts to Kelley on the seventh; and on that day the prior deeds of Roberts to Taaffe and Taaffe & Gay were filed for record, and the next day these suits were instituted. The transaction became public, got into the papers, and Kelley when approached claimed to have made the deal through his agent Dockery in good faith, and paid hard cash for the property.

On the tenth and twelfth of September, upon the affidavits of Taaffe & Gay, information was filed and criminal proceedings commenced in the St. Louis court of criminal correction against Roberts and Dockery for obtaining money by false representations and pretenses, to answer which they were afterwards arrested, brought back from Denver and lodged in jail.

I.   The matters of estoppel set up in the answer as a defense to this action are:   *First*.   The institution of the criminal proceedings against Roberts and Dockery, and, *second*, the mode in which the plaintiff conducted real-estate business in the name of Roberts thereby holding him out to the world as the owner, not only of the property in question, but of much other valuable real estate, the legal title to which on the records appeared in his name, and who had apparent authority from Taaffe and Taaffe & Gay to sell and convey the same.

The only merit that can be found in the first plea of estoppel is its novelty.   It seems to be based upon the idea, that, as it was charged in the criminal information by the prosecuting attorney under the elastic provision of section 1561, Revised Statutes, 1879, that the said Roberts and Dockery with intent to cheat and

defraud, etc., did obtain $8,000 lawful money, etc., the money and property of said Peter J. Taaffe and Thomas E. Gay," etc., to which they made the usual affidavit. That said Taaffe & Gay did thereby in some way ratify the act of Roberts in making the conveyances to Kelley, and elect to take the supposititious $8,000 mentioned in the information, and which was in some way to be obtained in the criminal proceeding in lieu of their real estate, and now ought to be estopped from setting up any claim to it. The statement of this defense is its own sufficient answer.

II. As to the second plea of estoppel, it is only necessary to say that there is no evidence tending to show that Kelley was induced to act upon any knowledge he had of Taaffe, and Taaffe & Gay's methods of doing business. On the contrary he expressly denies that he knew anything of them or their business or that he knew that Roberts had ever been in their employ or associated with them in any manner whatever, and claimed throughout the whole of his evidence that he acted solely upon the faith of the abstracts of the record that he obtained in the course of the negotiation, and which showed that by the record the title was in Roberts.

III. There is in fact but one question in this case, and that is: Had Kelley at the time he received the deed from Roberts to the Jefferson avenue and Pine street property actual notice of the prior unrecorded deed from Roberts to Taaffe?

While it appears from the evidence of Roberts that he told Kelley that the Jefferson avenue and Pine street property belonged to Taaffe, and the Channing avenue and Chestnut street property belonged to Taaffe & Gay, yet it does not appear, either from his evidence or that of Roberts, that either of them communicated to him prior to the transaction the fact that Roberts

had executed deeds conveying to them the legal title which he had held for them. So that it cannot certainly be said that Kelley had actual knowledge of the existence of these prior unrecorded deeds. It is not necessary, however, that he should have had such knowledge to charge him with notice under the statute. "Notice is actual when the purchaser either knows of the existence of the adverse claim or title, or is conscious of having the means of knowing, although he may not use them." *Speck v. Riggins*, 40 Mo. 405; *Maupin v. Emmons*, 47 Mo. 304; *Rhodes v. Outcalt*, 48 Mo. 367; *Eck v. Hatcher*, 58 Mo. 235; *Sensenderfer v. Kemp*, 83 Mo. 581; *Mason v. Black*, 87 Mo. 330.

A careful reading of all the evidence contained in the voluminous record in this case, of more than seven hundred pages, cannot fail to impress the mind of one, in the habit of analyzing and weighing human testimony, with the conviction, that while the idea of this fraudulent scheme of swindling the plaintiff and his partner out of their property probably originated in the mind of Dockery, and may have been first discussed and determined upon between him and Roberts, yet that early in the game it was communicated by Dockery to Kelley, and that all along there was a perfect understanding between them how Roberts in his relation to this property was to be worked to their profit, the lion's share of which was to go to Kelley as the only one who could raise any money, some of which was absolutely necessary in order to satisfy, and get rid of, Roberts. Whether this be a correct estimate of the weight of the evidence or not, and whether Kelley knew that Roberts had executed the prior deeds to his former employer, the plaintiff, or not, or whether Dockery communicated to him the fact that the property in Roberts' name on the records really belonged to Taaffe & Gay, or not, this much can certainly be said, from the knowledge he

had of Dockery and Roberts, their actions and conduct, and his intercourse with them pending these negotiations, the manner in which they were conducted by Dockery and his besotted tool, and finally consummated, as disclosed in his own evidence, he must have known that Roberts was not the owner of this or any other property; and if he did not know that Roberts had made the prior conveyances to Taaffe & Gay, and that they were the real owners of the property, it was simply because, conscious of having the means at hand to know, he wilfully abstained from using it, in order that he might more plausibly pose as an innocent purchaser without notice in a trade in which he actually received real estate and securities of the value of more than $10,000 by an outlay of only $1,000; and which was consummated in such a remarkable manner as to leave no doubt of its fraudulent character.

A synopsis of the evidence in this cause could not be given within anything like reasonable limits. After mature consideration, we find it sufficient to satisfy the mind and conscience of the chancellor that the defendant was a knowing and willing party to the fraud and that the plaintiff is entitled to the relief given by the decree of the trial court, which is accordingly affirmed. All concur. BARCLAY, J., concurs on the ground that there does not appear to be such a preponderance of evidence against the finding by the trial judge on the facts as would warrant a reversal of it.