CASS COUNTY v. GREEN, *Appellant*,

*Railroad Bonds: FRAUDULENT ISSUANCE OF: INNOCENT PURCHASER. Where certain railroad bonds were fraudulently issued by means of a covenous conspiracy formed between two of the justices of the county court, their deputy clerk, the prosecuting attorney

---

* The reporter is indebted to the Chief Justice for this syllabus.

and others, and, upon a division of the bonds in St. Louis, one of the conspirators received $55,000 in the fraudulent bonds, and effected a sale of them to Mastin & Co., bankers in Kansas City, two days thereafter, under circumstances which showed that both members of that firm, as well as defendant, had such notice of the fraud perpetrated, as should have forbidden a purchase of the bonds; *Held*, first, that although the evidence of such knowledge was not of a direct, positive character, yet, that it was sufficient, if it established the fact of knowledge by reasonable inferences deduced from facts which were proven; and to such obvious inferences courts are not permitted to close their eyes; second, that though, primarily, the presumption favors the holder of paper acquired before maturity, yet, that such a presumption dwindles into insignificance when circumstances of the nature above noted, occur; third, that the bonds having been fraudulently issued, the *onus* of showing their acquisition in good faith devolved on defendant; fourth, that Mastin & Co., as well as defendant, being chargeable with notice, the latter could not successfully invoke the doctrine which permits even a purchaser, with notice, to purchase from one without notice; and as there were many mysteries contradictions and incongruities apparent in the testimony, and defendant, whose deposition had been previously taken, conducted the trial, but failed to introduce any evidence in contradiction to, or explanation of, certain damaging statements, tending very strongly to establish his lack of good faith, that his failure to introduce such evidence, created a presumption adverse to his success; and such unfavorable presumption is very strong, when the *bona fides* of the given transaction is questioned by the form of the procedure, and the nature and organization of the court, where instituted; that, although the testimony of defendant tended to show the transfer of the bonds by him before suit brought, yet as such alleged transfer occurred the day after the notice of injunction was served on him, and with evident intent to evade the process of the court, and he had made statements about the bonds which he afterwards contradicted in his deposition; that, as the transferree of the bonds was not complaining, defendant could not be heard to vicariously complain; and the trial court having disbelieved his testimony respecting the transfer of the bonds, this court would do likewise; and held, further, that as defendant kept the bonds concealed so that their whereabouts could not be discovered, nor they be reached by ordinary process, and as defendant threatened to transfer the bonds, that, although the bonds were really invalid, yet, as they were apparently good, the remedy by law was manifestly inadequate, and equity would interfere—this being a case analogous to that where it interferes to remove a cloud upon a title to land.

*Appeal from Jackson Special Law and Equity Court.*—HON. R. E. COWAN, Judge.

This is an injunction to compel the cancellation of certain bonds of Cass county. The petition sets out that the bonds were issued in pursuance of an order of the county court of said county, which directed their issue for the purpose of funding the debt of the county on account of a subscription to the capital stock of the Missouri Pacific Railroad; that they were negotiable in form and transferable by delivery ; that they purported on their face to be issued under the authority of the act of the General Assembly approved March 24th, 1868, entitled " An act to enable counties, cities and incorporated towns to fund their respective debts;" that none of them were due, being by their terms payable at periods of between fifteen and twenty years from the 22nd of February, 1872; that in truth and in fact, at the time of making the order, there was not any debt whatever of the county on account of a subscription to the capital stock of said company, but the bonds were issued without any consideration, fraudulently and illegally, by two of the justices of the court in execution of a conspiracy formed between the said justices and certain other persons, among whom was one Cline; that the fifty-five bonds in controversy were Cline's share of the plunder, and were sold by him to Mastin & Co., who were cognizant of the conspiracy and fraud, and were by them sold to defendant, who, likewise, had notice of the facts; that plaintiff had repeatedly demanded them of defendant, who refused to deliver them up, and refused to obey the orders of the courts made in divers actions at law brought against him to compel him to deliver them up, and had concealed them so that they could not be seized by process of law; that in the meantime he was annoying and harrassing the county by suits brought and prosecuted in the name of fictitious persons, and pretended holders, for the

recovery of interest on them; that he, often falsely pretended that he had already transferred them; and that unless restrained from so doing, he would transfer them so as to render any decree in this case ineffectual.

The answer denies all the allegations of the petition charging fraud, conspiracy and illegality, and avers that long prior to the issue of the bonds the county had made a conditional subscription to a branch of the Tebo & Neosho Railroad, by which the county agreed to transfer to that company a subscription previously made to the Pacific Railroad, together with all interest accrued, if the bonds issued to the latter company were surrendered; that on the faith of said subscription, said road was built, and said bonds surrendered, and the bonds in controversy were issued to pay said subscription under the act of 1868, authorizing counties, cities and incorporated towns to fund their respective debts; and that the charges of fraud made in the petition were falsely and fraudulently made by the county to avoid its just liabilities, and, after obtaining a railroad on the faith of its promises, to defraud the company that built it, by false pretenses, murder and mob violence.

A reply was filed denying the new matter set up in the answer, and denying that the bonds were issued under the authority of the act of 1868, or of any law whatever.

A trial was had, and the court found that the bonds were fraudulently issued; that defendant purchased them under circumstances that ought to have excited his suspicions as a prudent and careful man, and caused him to make inquiry in regard to the making, executing and issuing of said bonds; that having failed to make such inquiry, he is chargeable with notice of all the facts he might have ascertained by proper inquiry; that at the time of the commencement of this suit the defendant had the possession, control and management of said bonds, and that they were negotiable; and decreed that the bonds be brought into court and delivered up by defendant and be cancelled.

*Cravens & Green* for appellant.

1.   The pleadings show upon their face that the plaintiff has a full and complete remedy at law, and that there is no equity in the case, in this, the reply to defendant's answer, denies that the bonds were issued under the act of the General Assembly of the State of Missouri, approved March 24th, 1868, or any other law, or that the county court had power or authority to issue said bonds, or that they are regular or valid on their face. If there was no power to issue the bonds, then they are void in the hands of any purchaser, and the plaintiff would have a complete defense to any suit upon them at law, and a court of equity has no jurisdiction, and the court should have sustained the objections of the defendant to the introduction of any evidence, and have dismissed the suit for want of equitable jurisdiction. A municipal corporation, obligors in a bond, cannot ask relief in equity that the obligee be enjoined from proceeding at law, and that the bond be surrendered, when its bill alleges that the bond was issued without authority and in violation of law and in fraud of the town, and that the obligee knew this when he took it. The rule is to dismiss plaintiff's bill if it appears to be grounded on a title merely legal and cognizable at law, notwithstanding the defendant has answered the bill. *Grand Chute v. Winegar*, 15 Wall. 355.

2.   It is necessary for the court to find that the banking house of Mastin & Co. purchased with notice of the alleged frauds, for if they were innocent purchasers for value, any purchaser from them, before maturity, would take them purged from the alleged frauds. This issue, which is the second made by the pleadings, and necessary to the determination of the case, is entirely ignored by the court in the decree, and it is not, in this respect, responsive to the issues. For this reason the decree should be reversed, and a decree rendered dismissing the plaintiff's suit with costs and damages.

3. Counsel argued at length that the evidence showed both Mastin & Co. and the defendant to be innocent purchasers.

*James O. Broadhead,* and *Gage & Ladd* for respondent.

1. The plaintiff is entitled to the relief granted, if the bonds were fraudulently issued and the defendant is not a *bona fide* holder thereof, for value, without notice of their invalidity. The bonds are valid on their face and are negotiable. Story's Eq. Jur., §§ 699, 710. The holder of negotiable securities, endorsed in the usual manner, if he has acquired them fraudulently, will be enjoined from negotiating them; because, if negotiated, the maker or endorser must pay them. *Osborne v. U. S. Bank,* 9 Wheat. 738, 848; Hilliard on Injunctions, Ch. 30; 1 Mad. 154–5; *Hamilton v. Cummings,* 1 Johns. Ch. 516; *Reed v. Bank,* 1 Paige Ch. 218; High on Injunctions, § 712; *Hood v. Aston,* 1 Russ. 412.

2. The failure of the defendant to deny or explain the material testimony of witnesses regarding his own acts and conversations, when it was in his power to do so, had such statements been false, or susceptible of explanation, is a confession on his part of their truth, and their obvious effect is to impeach the transaction. *Adams v. Adams,* 21 Wall. 185; *Comm. v. Webster,* 5 Cush. 295; *People v. Wharton,* 4 Barb. 438.

SHERWOOD, C. J.—Two questions of prominence present themselves: First, whether the evidence adduced suffices to support the allegations of the petition and warrant the decree rendered. Second, whether on the case made by the pleadings, the plaintiff has any standing in a court of equity. Defendant, seeking a reversal, holds in each instance the negative. As the pleadings are lengthy and the evidence voluminous, and as the substance of each is hereto prefixed, we will not discuss the evidence in de-

tail, nor give more than an outline of the petition which seeks the surrender and cancellation of 55 funding bonds of Cass county, for $1,000 each, (dated February 22nd, but issued March 1st, 1872,) and an order restraining defendant from their negotiation. This relief is asked on the ground that the bonds were fraudulently issued, and that Mastin & Co., as well as defendant, are purchasers with notice.

I.   Relative to the first point:   A careful perusal of the evidence has fully satisfied us that a conspiracy was formed by the parties named in the petition to secure the issuance of the bonds of Cass county and their transfer to and distribution among the conspirators; that this conspiracy was successful and the conspirators smitten with sudden fear at their own iniquitous success seized their ill-gotten gains and, justly apprehensive of popular indignation commensurate with the fraud perpetrated, sought safety in flight and opportunities in the distance for the secret and secure division of their plunder. This division occurred March 2nd, 1872, in St. Louis, and was marked as was the entire affair from inception to termination with the secrecy, hurry and trepidation usually incident to *larcenous* operations. A large portion of the bonds taken across the river to East St. Louis, and there placed in the custody of an express company for safe keeping, were afterwards recovered by the county in an action of replevin. Cline, the county attorney of Cass county, received, as his share of the spoil, $55,000 in bonds, and left on the same day. So conspicuously conclusive is the evidence regarding the fraudulent issuance of the bonds, that defendant does not seriously controvert it, but relies on the defense of being an innocent purchaser. (It is worthy of parenthetic remark in this connection, as one of the anomalies incident to the transfer of railroad bonds, that a purchaser of a different description is seldom, or never seen.) Let us examine the facts and weigh the evidence, in the endeavor to ascertain whether the claim which defendant

makes does indeed rest upon a substantial foundation.
And, as defendant claims also that John J. Mastin & Co.
occupy the like high-toned attitude in this regard as him-
self, and as their fates and fortunes seem to be indissolubly
blended, we will consider their respective claims in con-
nection with each other. After leaving St. Louis, Cline
is next seen in Kansas City, on the morning of the 4th of
March, 1872, engaged in the effort to sell his share of the
bonds. He approaches Thos. H. Mastin, of the firm of
John J. Mastin & Co., bankers, and endeavors to effect a
sale to him. Mastin states that no bonds were exhibited
to him; that he declined to purchase, when Cline pressed
the matter on him, stating that they were a good invest-
ment, being funding bonds; that there was nothing about
them to which objection could be made except that they
were signed by the deputy instead of by the clerk; but
that had been provided for in the order of the court; that
Cline, being asked why the bonds were not signed by the
clerk himself, replied that the latter was absent on a com-
mittee which had been sent to Clinton to look after the in-
terest of the county in the Memphis railroad; that witness
asked Cline as to an injunction and mandamus that had
been sued out, and was told by Cline that the mandamus
suit had been dismissed and the injunction fell with it;
that witness again declined to purchase, and on passing
out of the door to go to Independence, saw his brother and
partner, John J. Mastin, talking to their attorney, Black,
and to Cline in reference to the matter; that witness gather-
ed from the conversation that Cline had made the same
statements to witness' brother as previously made, regard-
ing the validity of the bonds, but that Black being inter-
rogated by the brother of witness did not concur in
Cline's opinion; that thereupon witness proceeded to Inde-
pendence, returning about 3 o'clock the same day. During
his absence the bonds were purchased for the firm by Jno.
J. Mastin, at 60 cents. While in Independence Thos. H.
Mastin related in Chrisman's office, with evident zest, the

trick whereby the clerk (of the Cass county court), opposed to funding the Pacific bonds, had been sent away on a committee to Clinton, and the bonds were signed by the deputy in his absence.

Now, it would seem very far from probable, and probability is the chief guide in placing a proper estimate upon evidence, that Thos. H. Mastin would see his brother and partner asked to purchase a large amount of bonds, which he, himself, had just refused to purchase, and yet pass him by without so much as a single word or gesture of warning or disapproval. And then take the conduct of Thos. H. Mastin in Chrisman's office. Did he rejoice at the subterfuge by which an honest clerk was spirited away and a dishonest deputy substituted in his stead, and the people of Cass county saddled with a large fraudulent debt, because he *loved fraud for fraud's sake?* or was it because he expected the fraud to be personally beneficial, to swell his revenues and enrich his coffers? The latter supposition is more creditable to him and more credible to us. But how, when and where, did Thos. H. Mastin derive the information that the clerk was opposed to issuing the bonds? And how, when and where that the county court of Cass county " got the advantage of the clerk?" Nothing that Mastin reveals as having transpired in the conversation with Cline afforded that information. Either, then, Cline in the conversation with Thos. H. Mastin, must have revealed more than the latter testified to, or else prior to the 4th of March Thos. H. Mastin must have been apprised of the conspiracy to get the clerk out of the way; a matter virtually predicted by Cline nearly a month before, when procuring and purchasing the services of the deputy Yelton; and Cline, about a week before his last visit to Kansas City, had been there and conversed with Thos. H. Mastin.

When we take all these matters into consideration, the conclusion is very strong that Mastin, who it does not appear had any business at Independence, went there in

order to be conveniently absent, being well aware that he at least knew too much to be an innocent purchaser. If he had notice, then that was notice to the firm of which he was a member. But there are other grounds for the belief that John J. Mastin was also aware of those things which should have precluded a purchase by him. He, when approached by Cline and asked to purchase the bonds, declined to "trade" until his attorney said they were all right.

He then took the bond and order to Black's office. What occurred there is not known, but it is certain, according to the testimony of Thos. H. Mastin, that Black, on coming down to the bank, did give an opinion in opposition to that given by Cline as to the validity of the bonds; and John J. Mastin says himself that Cline did not succeed in impressing Black favorably with the order.

Yet, notwithstanding this adverse opinion, leaving behind him the objectionable order which authorized the issuance of the bonds, he took the bond alone and consulted defendant about the validity of the issue. Green was not counsel for Mastin, and it is noteworthy, in this connection, that Mastin did not go to Green's law office, but to the *Times* office, where he "expected to see him." Green, the testimony shows, was the frequent purchaser of and dealer in railroad bonds, but he never inquired for the funding order, nor did Mastin offer it to Green, although the evidence shows that it is customary, when offering bonds for sale, to accompany them by the order which authorizes their issue.

In short, Mastin, who would not purchase till his attorney said so, concluded to buy, whether he said so or not; was more willing, in other words, to trust Green's judgment, without a funding order, than Black's with one. And Green was so highly pleased with the looks of the bond that after a brief examination of the law of 1868, without more ado, gave an enthusiastic opinion in favor of their validity. But Green did have a copy of the funding

order.   Mr. Allen's uncontradicted testimony shows this.
There were but three certified copies of the funding order
made out by Yelton, which were delivered to Cline.  Where
did Green procure his copy?   Not from Mastin if the lat-
ter is to be credited.   Who else then but from Cline?  Mr.
Allen states also that Green, when offering the bonds to him
for sale, represented himself as merely interested in selling
on commission for an acquaintance ; that Green's attention
was drawn to the fact that the specimen bond exhibited
" bore a different number from any authorized in the other
paper;" that the bond " was signed by a deputy, and was
either dated or interest made payable on a legal holi-
day."   Mr. Allen expressed doubts on all these points.
He also states that Green left the bond with him, with the
understanding of returning at a later hour; that on his
return, Green stated that since the first interview, he had
met some one from Cass county.   Mr. Allen thinks Green
said a " county officer " of that county, who had personal
knowledge of some of the matters raised in the first con-
versation, and knew them to be all right.   The only coun-
ty officer in town that day, so far as the record discloses,
was Cline ; but Green is particular to state in his deposition
taken before trial, that it was not till after his purchase of
the bonds from Mastin & Co. that he saw Cline, and then
only to speak, shake hands and pass on.   Green in his dep-
osition is altogether silent about a funding order, and pro-
fesses not even to know that the bonds " were issued for a
railroad subscription."   Yet, if Allen's testimony is true,
and it is nowhere contradicted, such ignorance was wholly
impossible.   The precise time that the sale was consu-
mated between Green and Mastin, and between the latter
and Cline, is not disclosed.   It is known, however, that
Green's check for $10,000 was given before Cline was paid.
Green, who is evidently possessed of more than ordinary
shrewdness and intelligence, had two interviews with Allen
and at least three with Mastin before completing the pur-
chase.   It seems difficult of belief that Green would have

ventured to offer the bonds to Allen for 75 cents, and even
to make a reduction on that figure of from one to one and
one-half cents; "to deduct part of his commission," and
to give assurances that "the other party would make some
reduction," unless he both knew that he had authority so
to do, and that the figure at which he offered to sell would
afford a profitable margin to his "acquaintance" or prin-
cipal. But Jno. J. Mastin is careful to say that he never
told Green what he paid for the bonds. These statements
of Green to Allen, and of Mastin, when a witness, cannot
be readily reconciled. If Mr. Allen gives a correct ver-
sion of the affair, it very strongly indicates that Green had
seen Cline, the only "county officer" then in town, before
making his purchase. If he did see him, it is scarcely
credible, if really desirous of becoming what he now so
zealously professes to be, an "innocent purchaser," that he
failed to make full inquiry touching the matters he and
Allen had just before talked of. Allen's testimony, too,
points very decidedly towards a secret understanding or
complicity between Green and Mastin respecting the pur-
chase of the bonds, and it is not at all easy, on perusing
the evidence, to divest the mind of such unfavorable im-
pression. Nor does it tend to diminish that impression,
when we see the wondrous anxiety, after the fraud became
public, that Green displayed to stop payment of the drafts
and acceptances given to Cline by Mastin & Co., and to
search, with similar purpose, the dead body of the suicide
Higgins (the only one of the bond brokers who gave token
of a conscience). If Green was indeed an innocent pur-
chaser, what interest could _he_ feel, what need _he_ care,
whether those certificates and acceptances were paid or
protested? Green says his purpose was to protect himself
and the county. No doubt such solicitude in behalf of the
county was, though tardy, highly commendable. But
what protection did an "innocent purchaser" need? The
only rational hypothesis with which this anxiety of Green's

can be reconciled, is his collusion with Mastin & Co. in the purchase of the bonds.

Besides all that, even if we concede that the $10,000 was really paid by Green, and paid in good faith, what excuse has he to offer for paying his note for $29,600, long after discovery of the fraud? His defense in any action by Mastin & Co. on the note would, it seems, have been ample. He certainly, therefore, can lay no claim to having paid that sum, at least, in good faith. And Thos. H. Mastin's testimony shows that Green was fully aware that if the bonds were "fraudulent or forged, he would have recourse" against them. John J. Mastin says the note of Green was paid "in money or its equivalent." What equivalent? Their cash-book shows no such payment. John J. Mastin states that Cline's administrator threatened, unless they paid the acceptances given to Cline, to throw the firm into bankrupty, and thereupon they paid them. And on the same day Green is called upon and pays his note, as it is said, thus keeping up the coincidence of payments which began when Green drew his check, the only difference being that payment of the check took place just *before* Cline was paid, and the payment of the note just *after* his administrator was paid. But what caused Mastin & Co. to so readily yield to the demand of Cline's administrator? Their defense, too, would appear to have been good. These are mysteries which deserved and should have received the fullest explanation. The above, however, are not the only mysteries, incongruities and contradictions presented by this record.

When the endeavor was made by the Cass county officials in the latter part of March, 1872, to discover the *locus in quo* of the bonds in order to replevy them, Thomas H. Mastin stated that they were not interested, that they had only purchased as the "agents or brokers" of Green; and yet, when on the same day, and a brief space thereafter, Green, in the presence of Thomas H. Mastin, states em-

phatically that he bought the bonds of John J. Mastin & Co.; had nothing to do with Cline in the transaction, Mastin stands mute, interposing no denial. When the latter is asked where the bonds were, he said Green had taken them from his safe the evening before. Green, replying to the same question, says that he had "sent" or "shipped" the bonds East some six days before, and they were beyond his reach. But the deposition of Green shows that up to the 10th of October, 1873, when the writ of replevin and notice of injunction were served on him, the bonds were in his possession, or under his control, and had never left Kansas City. When we reflect on the foregoing diverse statements, and numerous others of like kidney scattered through this record, these questions come unbidden before us. *Need honesty shelter itself behind prevarication? Must good faith summon to its aid the motley troop of falsehood?* No one so bold as to answer yea. We have hitherto examined the facts of this case, as if the *onus probandi* were on the county.

But the evidence having established the fraudulent issuance of the bonds, that burden is cast in all its weight on the shoulders of the defendant. This ruling is in full accord with our most recent adjudication. *Hamilton v. Marks*, (63 Mo. 167.) In that case our approval was bestowed upon the views of the latest elementary writer on this subject: "That if the maker      *      *      *      * proves that there was fraud or illegality in the inception of the instrument; or if the circumstances raise a strong suspicion of fraud or illegality, the owner must respond by showing that he acquired it *bona fide*, for value in the usual course of business while current, and under circumstances which create no suspicion, that he knew the facts which impeach its validity." (Daniel Neg. Instr. Sec. 81⁵.) Primarially, as a matter of course, the presumption favors the holder of negotiable paper acquired before maturity. (*Horton v. Bayne*, 52 Mo. 531.) But this presumption must be for naught held and esteemed, when a record, such as

this, stares us in the face; and we are fully persuaded that in order to hold either Green or Mastin & Co., innocent purchasers, we must shut our eyes to most obvious inferences deducible from proven facts, and close our ears to arguments based thereon of most persuasive cogency.

Our object in considering the claim of Mastin & Co., to be considered innocent purchasers, in connection with a like claim made by Green, is because of the assertion made by the latter, that if the former purchased without notice, defendant, even if a purchaser with notice, would take a title purged from all fraud. There is no doubt of the general correctness of this assertion, (2 Glf. Ev. § 171,) but inasmuch as we regard both Mastin & Co. and defendant as purchasers with notice, this doctrine has here no application.

But we must not conclude our remarks touching the sufficiency of the evidence before adverting to some other matters. The defendant was present at and conducted the trial. The opportunity for giving explanation of, or contradiction to, the damaging statements made by Allen and others, which tended to show defendant's want of good faith, was thus open to him, and yet he failed to embrace it. The presumption, under such circumstances, is always adverse to the party thus making default. (*Adams v. Adams*, 21 Wal. 185; *Henderson v. Henderson*, 55 Mo. 559.) And this failure is rendered more strikingly apparent when it is remembered that the good faith of defendant, is, by the very form of this procedure, directly called in question; questioned in a court of equity, which cannot look upon unfair dealing with the least degree of allowance; questioned in a court accustomed from its very nature and organization to track fraud through all its crooked pathways, and to drag it forth discomfited from its most hidden recesses.

Again, it is insisted that the judgment must be reversed because the evidence shows that the bonds were transferred before suit brought. That transfer, it is said, oc-

curred on the 11th day of October; but the injunction notice was served on the 10th, and the injunction granted on the 18th of that month. The party to whom the bonds are alleged to have been transferred, is not here complaining, and the defendant cannot be heard to vicariously complain. Besides, the court below may perhaps have concluded (and we are not prepared to dispute the correctness of the conclusion) that defendant's assertion respecting the transfer of the bonds rested on no more secure foundation than his claim to being an innocent purchaser.

II. In regard to our second point: The case of *Grand Chute v. Winegar*, (15 Wallace 355, 373,) is cited as showing that plaintiff is entitled to no relief in equity. But that case is totally unlike this. There an injunction was prayed of a suit at law on some bonds, on the ground that the bonds were void. It does not appear whether the bonds were not mature at the time of their reception, nor that the holder threatened to negotiate them, and the bill was very properly dismissed because the remedy at law was amply adequate. Here, on the contrary, though the reply shows that the bonds are void, yet the petition charges, in addition to the matters already noticed, that repeated demands and actions at law had proved unavailing to recover possession of the bonds from defendant; that defendant refused to obey the order of the court and deliver possession of the bonds, but kept them concealed so that they could not be reached by process at law; that the bonds were negotiable in form and transferable by delivery; that defendant pretended he had already transferred them, and unless restrained defendant would transfer them, so that any decree rendered would be ineffectual. It is quite clear that any remedy at law would, in this case, be wholly inadequate and, therefore, equity has jurisdiction. This proceeding is somewhat analogous to that where a party is seeking to remove a cloud upon his title; the title held by his adversary, though void, is on its face valid, and may be made the basis for repeated actions at law.

(*Harrington v. Utterback*, 57 Mo. 519.)    So in case of these bonds, which though void, are yet apparently good, the equity of the plaintiff is equally clear to the relief sought, and we affirm the judgment.    All concur except HOUGH, J., not sitting.

                                                          AFFIRMED.