STOPAQUILA.ORG, et al., Appellants,

v.

CITY OF PECULIAR, Missouri, Respondent.

No. SC 87302.

Supreme Court of Missouri, En Banc.

Dec. 19, 2006.

**897**

Gerard D. Eftink, Raymore, for Appellants.

Stanley D. Davis, John C. Dods, III, Joseph M. Rebein, Elizabeth C. Burke, E. Sid Douglas III, David W. Bushek, Kansas City, James E. Thompson, Jr., Harrisonville, for Respondent.

Eric Cunningham, Cape Girardeau City Atty., Cape Girardeau, Morley Swingle, Cape Girardeau County Prosecuting Atty., Jackson, Stanley J. Wallach, City of Fenton Assistant City Atty., The Wallach Law Firm, St. Louis, C. Todd Ahrens, Hannibal City atty., Ahrens, Hale & Lemon, LLC, Hannibal, B. Allen Garner, City Counselor, Independence, Nathan M. Nickolaus, City Atty., Jefferson City, William D. Geary, Assistant City Atty., Kansas City, Daniel Wichmer, City Atty., Springfield, Lisa M. Robertson, City Atty., St. Joseph, James B. Lowery, David M. Kurtz, Smith, Lewis, LLP, Columbia, Thomas M. Byrne, General Counsel, St. Louis, for Amicus Curiae.

**LAURA DENVIR STITH, Judge.**

Appellants sued the City of Peculiar, arguing that Peculiar's board of aldermen acted beyond its constitutional authority in authorizing the issuance of $140 million in 30-year revenue bonds for construction of a power plant to be leased by Peculiar to Aquila, a private power company. Appellants argue that article VI, section 27 of the Missouri Constitution requires voter approval for issuance of bonds to build a power plant. The trial court rejected this argument, finding that the Missouri Constitution authorized the bonds to issue through the approval of a majority of the Peculiar board.

This Court agrees. While article VI, section 27 authorizes issuance of revenue bonds only upon voter approval, here Peculiar relied on article VI, section 27(b). That section specifically authorizes the issuance of revenue bonds upon approval by a majority of the governing body of a municipality for a facility that, as here, is not to be operated by the municipality for revenue-producing purposes but is to be leased to and operated by a private corporation for a commercial purpose. The judgment of the trial court is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are not in dispute. Aquila, a utility company, owns land in Cass County near Peculiar. Aquila sought authority from Cass County and from Peculiar to undertake the following projects: (1) construction of electric power generating facilities on property located two miles south of Peculiar in an unincorporated sec-

tion of Cass County; (2) construction of a transmission substation facility in an unincorporated section of Cass County northwest of Peculiar; and (3) improvement of certain transmission lines in Cass County and Peculiar. The parties concede that the revenue bonds were to be issued for construction of a power plant by Aquila.

Peculiar and Aquila drafted an "Economic Development Agreement" that, if approved, would dictate the terms of the project's construction, financing, maintenance and operation. Under the Agreement: (1) Peculiar would issue $140 million in 30-year revenue bonds to finance the project; (2) Aquila would convey title to the land and facilities to Peculiar along with $700,000 in exchange for the bonds, thereby making Aquila the bondholder; (3) Peculiar would lease the land and facilities back to Aquila during the term of the bonds and use the revenue from the lease to retire the bonds; (4) Aquila would retain any revenue from the sale of electricity generated by the power plant; and (5) Aquila would have an option to purchase the power plant for $1,000 upon retirement of the bonds.

At all times, Aquila would be solely responsible for customer billings, construc-tion, operation, insurance, and maintenance of the facilities. The Agreement also provided that Aquila would be free from tax liability for the duration of the lease,[1] but it would make payments in lieu of taxes ("PILOTs") to Cass County, the Raymore–Peculiar School District, the Cass County Library District, and the West Peculiar Fire Protection District during the lease term. The basic terms of the Agreement were presented to the Peculiar board on December 7, 2004, and it gave its preliminary approval by a 4–2 vote.

■ Before the Peculiar board approved the project, StopAquila.org and individual plaintiffs who either live in Peculiar or near to the proposed construction site (hereinafter "StopAquila" or "Appellants") filed a petition seeking to enjoin the project and a declaration that the bond issue violated article VI, sections 27 and 27(a) of the Missouri Constitution. The petition alleges that sections 27 and 27(a) require that issuance of bonds for a power plant be submitted to a public vote and that plaintiffs would be damaged in several respects by the project, including erosion of property values and a loss of tax revenue from the tax abatement.[2] Peculiar filed a coun-

1. At oral argument, Peculiar conceded that, despite the broad language in the Agreement purporting to exempt Aquila from tax liability in jurisdictions other than Peculiar, Peculiar was not authorized to compromise any right that other taxing jurisdictions might have to tax Aquila and that Peculiar's contract with Aquila, therefore, could not affect the taxing authority of these other jurisdictions.

2. Although Peculiar did not challenge Appellants' standing in the trial court, in this Court it argues that Appellants lack standing because they have not sufficiently alleged that they were injured as taxpayers nor have they asserted that they are electors of the City of Peculiar and, thus, injured by the failure to allow them to vote on issuance of the bonds. Nothing in the Constitution or in this Court's jurisprudence limits standing to those who have already registered and voted in past city elections, however. Appellants are adults, and they allege that some of their number are residents of Peculiar injured by the denial of their right to vote on the bonds. The record discloses no facts that would suggest they are ineligible to vote, and Missouri law allows citizens to register to vote up to five weeks before an election. Sec. 115.135.1, RSMo Supp.2005 (providing that voters must be registered by the fourth Wednesday before an election). Thus, it is not required for standing purposes that Appellants allege they are registered voters or have voted in the past. For this reason, Appellants' allegations, while not models of clarity, were sufficient to establish Appellants' eligibility to vote, which is enough to confer voter standing in this action.

ter-claim seeking a declaration that article VI, section 27(b) of the Missouri Constitution authorizes the issuance of the bonds upon approval by its board.

On December 27, 2004, the trial court ruled that the Peculiar board was authorized under article VI, section 27(b) to approve issuance of the revenue bonds. Peculiar issued the bonds on or about December 31, 2004. During the pendency of this appeal, Aquila constructed the power plant, which is now operational.[3]

## II. STANDARD OF REVIEW

■■■ This Court reviews the trial court's interpretation of the Missouri Constitution *de novo*. *State v. Beine*, 162 S.W.3d 483, 490 (Mo. banc 2005). In general, constitutional provisions are subject to the same rules of construction as other laws, except that constitutional provisions are given a broader construction due to their more permanent character. *State ex inf. Ashcroft ex rel. Bell v. City of Fulton*, 642 S.W.2d 617, 620 (Mo. banc 1982). "[C]onstitutional provisions are to be construed as mandatory unless, by express provision or by necessary implication, a different intention is manifest." *State ex inf. Dalton v. Dearing*, 364 Mo. 475, 263 S.W.2d 381, 385 (Mo. banc 1954). Here, this Court must decide whether sections 27, 27(a), or 27(b) of article VI of Missouri's Constitution authorized Peculiar's approval of issuance of the revenue bonds at issue. "Statutory cities, acting without

a constitutional home rule charter, cannot act without specific grants of power." *Cape Motor Lodge, Inc. v. City of Cape Girardeau*, 706 S.W.2d 208, 212 (Mo. banc 1986), citing *State ex rel. Mitchell v. City of Sikeston*, 555 S.W.2d 281 (Mo. banc 1977).

## III. ANALYSIS

### A. Historical Authorization for Issuance of Revenue Bonds.

For almost as long as municipalities have sought to issue revenue bonds, the propriety of the bond issue has been the subject of litigation. *See, e.g., State ex rel. Lexington & St. Louis R.R. Co. v. Saline County Court*, 45 Mo. 242 (Mo. banc 1870) (railroad sought to compel issuance of bonds where authorized by vote); *Cass County v. Green*, 66 Mo. 498 (Mo. banc 1877) (injunction to cancel Cass County bonds). Prior to the adoption of the Missouri Constitution of 1945, courts had to undertake complex efforts at statutory interpretation to determine whether a municipality had authority to issue particular types of revenue bonds without voter approval.[4]

■■■ The 1945 Missouri Constitution authorized municipalities to issue revenue bonds for municipally owned and operated "revenue producing water, gas or electric light works, heating or power plants, or airports" upon approval of four-sevenths of the voters. Mo. Const. art. VI, sec. 27, RSMo 1949.[5] *State ex rel. City of Fulton*

---

3. In a related suit, Cass County and StopAquila have challenged the regulatory and zoning approval for the location and operation of the Aquila plant. *See StopAquila.Org v. Aquila, Inc.*, 180 S.W.3d 24 (Mo.App. W.D.2005).

4. *Compare State ex rel. City of Blue Springs v. McWilliams*, 335 Mo. 816, 74 S.W.2d 363, 367 (banc 1934) (holding that municipalities must obtain two-thirds voter approval before issuing revenue bonds to construct municipal

waterworks), with *City of Springfield v. Monday*, 353 Mo. 981, 185 S.W.2d 788, 792 (banc 1945) (holding that revenue bonds for electric light, gas, heating and transportation may be issued without voter approval, citing cases).

5. Although the title conferred on a provision by the reviser of statutes is not entitled to deference, it is notable that the title originally conferred on section 27 was "Revenue bonds

*v. Smith*, 355 Mo. 27, 194 S.W.2d 302, 304–05 (banc 1946), held this provision to be self-executing.

In 1960, the voters amended section 27 to grant cities additional power to issue revenue bonds for "plants to be leased to private persons or corporations for manufacturing and industrial development purposes" with approval of four-sevenths of the voters.[6] Unlike the provision for municipally owned and operated power plants, which was self-executing, this Court found "this innovation by way of municipal financing of industrial projects" to be "so new and untried, its possibilities so sweeping, and its operation and potentialities so utterly uncertain (and great) as to imperatively require statutory charting of its course." *In re Monroe City*, 359 S.W.2d 706, 711 (Mo. banc 1962).[7]

**B. 1978 Amendments to Article VI Added Current Section 27 and Sections 27(a), (b) and (c).**

In 1978, members of each house of the General Assembly introduced similar but separate proposed amendments to article VI that repealed the pre–1978 version of

section 27 and proposed a new constitutional section or sections addressing issuance of revenue bonds by municipalities. These proposed amendments were ultimately submitted to the voters at the November 1978 general election as constitutional amendments 6 and 7. *Ashcroft*, 642 S.W.2d at 618–19.

The House proposal, amendment 7, was approved by the voters and is now article VI, section 27 of the Missouri Constitution. *Ashcroft*, 642 S.W.2d at 619, 621; Mo. Const. art. VI, sec. 27, RSMo 2000.[8] It requires approval by a majority of voters before a municipality or a joint board of cooperating municipalities may issue revenue bonds for utility plants to be owned and operated by the municipality or for manufacturing or industrial development plants to be leased or disposed of by the municipality. Mo. Const. art. VI, sec. 27.[9]

The Senate proposal, amendment 6, was also approved and is now article VI, sections 27(a), 27(b) and 27(c) of the Missouri Constitution. *Ashcroft*, 642 S.W.2d at 618–19, 621. Section 27(a) requires voter approval before a municipality can issue

---

for municipally owned utilities." Mo. Const. art. VI, sec. 27, RSMo 1949.

**6.** Simultaneously, a section was added to the Constitution that allows municipalities to issue general obligation bonds for manufacturing and industrial development purposes with approval of two-thirds of the voters. Mo. Const. art. VI, sec. 23, RSMo 2000.

**7.** Section 27 was amended twice more before 1978. In 1965, it was amended to permit municipally financed manufacturing and industrial projects to be sold as well as leased. *See Wring v. City of Jefferson*, 413 S.W.2d 292, 295 (Mo. banc 1967). In 1974, it was again amended to reduce the number of votes required for approval of issuance of revenue bonds from four-sevenths to a simple majority. Mo. Const. art. VI, sec. 27, RSMo Supp. 1975.

**8.** Unless otherwise specified, all subsequent statutory and constitutional references are to RSMo 2000.

**9.** Peculiar argues, and the trial court found, that section 27 only permits cities to act jointly with a joint board or commission to issue revenue bonds and that bonds issued by cities alone are thus addressed only by sections 27(a) and (b). The wording of section 27 clearly states that it applies to any city or incorporated town or village, and to any joint board established by a joint contract between municipalities or political subdivisions, making both cities acting alone and joint boards alternative permissible issuers of the revenue bonds authorized in that section. *Cf.* Mo. Const. art. VI, sec. 27(a), (b) (permitting issuance of revenue bonds by individual counties in addition to by individual cities, incorporated towns and villages, but not authorizing issuance by joint boards).

bonds for municipally owned and operated revenue producing power plants, but section 27(b) authorizes a municipality's governing body to approve issuance of revenue bonds for a facility to be leased or otherwise disposed of to a private entity that would operate the facility for its commercial, manufacturing, warehousing, or industrial development purposes. Mo. Const. art. VI, sec. 27(a)-(b).[10] The question before this Court is whether section 27(b) authorizes the revenue bonds issued by Peculiar.

### C. Authority Of City To Issue Revenue Bonds Under Section 27(b).

#### 1. Section 27(b) Permits Issuance of Revenue Bonds by the Board.

This Court's analysis necessarily begins with the words of section 27(b), which Peculiar argues clearly authorize its issuance of the revenue bonds. Section 27(b) states:

> Any county, city or incorporated town or village in this state, **by a majority vote of the governing body thereof,** may issue and sell its negotiable interest bearing **revenue bonds for the purpose of paying all or part of the cost of purchasing, constructing, extending or improving any facility to be leased or otherwise disposed of pursuant to law to private persons or corporations for manufacturing, commercial, warehousing and industrial development purposes,** including the real estate, buildings, fixtures, and machinery. The cost of operation and maintenance and the principal and interest of the bonds shall be payable solely from the revenues derived by the county, city or incorporated town or village from the lease or other disposal of the facility.

Mo. Const. art. VI, sec. 27(b) (emphasis added).

By its terms, section 27(b) authorizes a municipality: (1) upon a vote of the majority of its governing body (rather than of the general electorate); (2) to issue and sell revenue bonds; (3) for the purpose of paying for facilities to be leased to private persons or corporations; (4) when the facilities are for manufacturing, commercial, warehousing or industrial development purposes; and (5) the cost of operation and maintenance of the facility and the principal and interest of the bonds shall be payable solely from the revenues derived from the lease or other disposal of the facilities.

StopAquila does not dispute that Peculiar's approval of the revenue bonds complied with requirements 1, 2, 3 and 5 just listed. Specifically, Peculiar's governing body approved the issuance of revenue bonds (requirement 1); issued and sold the bonds (requirement 2); for the purpose of paying for facilities to be leased to Aquila, a private corporation (requirement 3); and the revenues from the lease provide the sole source of payment for the principal and interest of the bonds, with Aquila solely responsible for the operation and maintenance of the facility (requirement 5).

■ StopAquila argues, however, that the Aquila plant fails to meet requirement (4), that the facilities be used for "manufacturing, commercial, warehousing or industrial development purposes." Aquila disagrees, noting that the plant is to be used for the commercial purpose of generating and selling electricity and "commercial purposes" should include the generation of electricity to be sold by Aquila. The determinative issue, thus, becomes the meaning of the term "commercial purposes" as used in section 27(b).[11]

---

**10.** Section 27(c) defines revenue bonds and is not in controversy in this case.

**11.** The parties do not ask the Court to address whether the generation and sale of electricity

■ This Court rejected a parallel attempt to construe the word "commercial" narrowly in the context of determining the reach of this State's taxing statutes in *King v. Laclede Gas Co.*, 648 S.W.2d 113, 115 (Mo. banc 1983). As *King* and other cases have noted, when construing statutes or constitutional provisions, the primary rule is to consider words in their plain and ordinary meaning. *See, e.g., King*, 648 S.W.2d at 115 (statutes); *Akin v. Mo. Gaming Comm'n*, 956 S.W.2d 261, 263 (Mo. banc 1997) ("every word employed in the constitution is to be expounded in its plain, obvious, and common-sense meaning"). When a term is undefined, the Court looks to its plain and ordinary meaning as found in the dictionary. *Tendai v. Mo. Bd. of Registration for Healing Arts*, 161 S.W.3d 358, 369 (Mo. banc 2005).

In *King*, as here, the defendant was a utility company in the business of buying and selling electricity. It alleged, however, that the underground storage facilities in which it stored natural gas for use in generating electricity when needed for its customers were not part of its commercial operation. Stating that "[t]he only issue here is the statutory interpretation of the term 'commercial,'" 648 S.W.2d at 114, *King* noted that the dictionary definition of the term "commercial" is quite broad and includes any operation that "has financial profit as a primary aim." *Id.* at 115.

Applying that definition to the issue whether Laclede Gas' storage tanks were used in commerce, *King* held that Laclede's business of buying and selling electricity was clearly commerce and "[t]he

facts of this case clearly indicate that the use of the electricity was such an integral part of the commercial activities of the taxpayer that to construe the use as unrelated to commerce would result in a rejection of the plain meaning of the statute. . . . The facilities were essential to the utility's successful commercial operation." *Id. King* expressly overruled cases more narrowly construing the word "commercial" to the extent that they were inconsistent. *Id.*

*King's* analysis is directly applicable here. Aquila, like Laclede Gas, is in the business of buying and selling electricity. Here, as in *King*, the utility unquestionably will seek to sell, i.e., engage in commerce, and profit from the electricity it generates at the Peculiar plant. Reference to other dictionaries confirms the broad meaning of the word "commerce" as referring to matters relating to commerce or which have profit as a primary motive.[12] Under both *King* and the plain dictionary definition of the term "commercial," then, the Peculiar plant is for "commercial purposes."

**2. Section 27(a) Does Not Apply to Power Plants Not Owned and Operated by the City Itself.**

StopAquila argues that even if the term "commercial purposes" otherwise could be read to include power plants, it must be more narrowly construed because the words "power plant" are used in section 27(a) expressly and if the voters had wanted section 27(b) to apply to power plants

could also constitute manufacturing or industrial development purposes.

**12.** Consultation of multiple dictionaries reveals two primary definitions of "commercial": (1) of or relating to commerce; and (2) having profit as the primary aim. *See* American Heritage Dictionary (4th Ed.2000); Oxford American College Dictionary (2002);

Webster's Third New International Dictionary of the English Language Unabridged (1993) (all listing these as the first two definitions of "commercial"). Each of these dictionaries also defines "commerce" as the buying and selling of goods, especially on a large scale. *Id.*

those same words would be repeated in section 27(b).

StopAquila's interpretation of section 27(a) would require the Court to reject the plain meaning of "commercial." Equally importantly, it ignores the fact that section 27(a) applies only to a small subset of power plant projects, which does not include the Aquila plant at issue here. More specifically, section 27(a) says that the voters may by majority vote approve issuance and sale of:

negotiable interest bearing revenue bonds for the purpose of paying all or part of the cost of purchasing, constructing, extending or improving any of the following: (1) revenue producing water, gas or electric light works, heating or power plants; or (2) airports; to be owned exclusively by the county, city or incorporated town or village the cost of operation and maintenance and the principal and interest of the bonds to be payable solely from the revenues derived by the county, city or incorporated town or village from the operation of the utility or the airport.

Mo Const. art. VI, section 27(a). By its terms, section 27(a) only governs Peculiar's issuance of revenue bonds if they are used to build a revenue producing power plant that is "to be owned exclusively by" the city, and the cost of the "operation and maintenance [of the power plant] and the principal and interest of the bonds" is to be "payable solely from the revenues de-

rived by [Peculiar] . . . from the operation of the utility." [13]

Here, however, Peculiar has leased the plant to Aquila, a private party, which may purchase it for $1,000 at the end of the lease. In this case, the cost of operation and maintenance of the power plant and the principal and interest of the bonds will *not be* payable solely, or indeed at all, from the revenues Peculiar derives from the operation of the plant, for Peculiar is not responsible for the plant's operation, nor will it derive any revenues therefrom. The costs of the plant's operation and any revenues therefrom will be borne and retained by Aquila; Peculiar's revenue derives from the lease to Aquila, not from the operation of the plant.

This is exactly the situation to which section 27(b) is intended to apply. As set out at length above, section 27(b) specifically permits the governing body of a municipality to approve by majority vote the issuance of revenue bonds for any commercial, industrial development, manufacturing or warehousing purposes, where, as here, the facility is "to be leased or otherwise disposed of pursuant to law to private persons or corporations" and so long as the "cost of operation and maintenance and the principal and interest of the bonds shall be payable solely from the revenues derived by the county, city or incorporated town or village from the lease or other

---

13. The term "revenue producing" has been in section 27 since the original Missouri Constitution of 1945 and has only been applied to municipally owned and operated public utilities. *In re Monroe City*, 359 S.W.2d 706, 710 (Mo. banc 1962) (noting that original section 27 only permitted municipalities to issue revenue bonds to finance "municipally owned public utilities and municipally owned airports"). Indeed, the change to allow issuance of revenue bonds to finance private developments in 1960 was thought to be so novel, sweeping, and uncertain that this Court held it was not self-executing despite the self-executing nature of the remainder of section 27. *Compare State ex rel. City of Fulton v. Smith*, 355 Mo. 27, 194 S.W.2d 302, 304–05 (banc 1946) (holding that original section 27 is self-executing), with *In re Monroe City*, 359 S.W.2d at 711 (holding that municipal finance of facilities to be leased introduced "a wholly new concept of municipal government function" so that 1960 amendment to section 27 is not self-executing).

disposal of the facility." Mo. Const. art. VI, sec. 27(b).

Section 27(b) by its terms applies to all commercial, manufacturing, industrial development and warehousing facilities to be leased to private entities, not merely to a subset thereof such as power plants. Because, as set out at length above, Aquila's plant is to be used for commercial purposes, it comes within section 27(b). The Peculiar board acted within its authority in authorizing the bond issue in this case.

This distinction between requiring voter approval of revenue bonds issued for plants to be operated by the municipality under section 27(a), but allowing governing body approval of revenue bonds for privately operated plants under section 27(b), is a rational one. The retention of risk by the municipality is different in the two instances. "An undertaking on the part of the city to maintain and operate such a utility necessarily entails the hazard of some loss, direct or indirect, of the general revenue, and the uniform legislative policy of this State, evidenced by its Constitution and statutes, is that assent thereto of the inhabitants of the city at an election held for that purpose is essential." *State ex rel. City of Blue Springs v. McWilliams*, 335 Mo. 816, 74 S.W.2d 363, 367 (banc 1934).

■ Although it is clear that revenue bonds do not result in general obligations upon the city, *see City of Maryville v. Cushman*, 363 Mo. 87, 249 S.W.2d 347, 351 (banc 1952) ("We have many times ruled that bonds payable solely from the revenues of a municipal utility, service or facility, and not from taxation, are not a general municipal indebtedness within the Constitution"), where the city is operating and maintaining the utility, it may retain greater contingent risk than if it has contracted the operation and maintenance to a third party. *City of Springfield v. Monday*, 353 Mo. 981, 185 S.W.2d 788, 791

(banc 1945) (holding that a city retains contingent liability on revenue bonds where it is maintaining and operating the utility). It is sensible, then, that the voters approved retaining the requirement of a public vote for all instances of municipal operation and maintenance of a utility, but did not require such a vote for issuance of bonds for commercial developments—whether power plants or otherwise—that were to be leased where the bonds would be retired solely from revenue derived from the lease.

**3. Article VI, Section 27's authorization of Other Methods of Issuing Revenue Bonds Cannot Limit the Reach of Section 27(b).**

■ StopAquila also contends that, even if the use of the term "power plants" in section 27(a) does not prevent section 27(b)'s application to leased power plants operated by a private entity for commercial purposes, such an interpretation of sections 27(a) and (b) puts them into irreconcilable conflict with article VI, section 27 of the Constitution. StopAquila so argues because section 27 permits the building of power plants, airports, and other revenue producing utility plants to be owned and operated by a city or joint board or to be leased to private companies upon a majority vote of the people of the city or joint board or commission of cities authorizing the project. Mo. Const. art. VI, sec. 27. This section, as well as sections 27(a) and (b), were adopted by the voters at the same 1978 election.

StopAquila's argument hinges on the assumption that the Missouri Constitution cannot confer alternative methods of exercising power upon Missouri municipalities and that there is an inherent conflict between the provisions of section 27, on the one hand, and sections 27(a), (b) and (c) on the other hand, because they provide vary-

ing methods of approving such projects. This is not correct.

As *Ashcroft* noted, "[t]he test for determining whether a conflict exists is whether one amendment prohibits what the other permits or vice versa." 642 S.W.2d at 620. Where two provisions are not irreconcilably inconsistent, both must stand even if there is "some tension between them." *Id.*[14] In *Ashcroft*, relator prosecuted an action in *quo warranto* seeking a declaration that Fulton's bond issue was invalid because both section 27 and sections 27(a) and (b) failed to become part of the Constitution in 1978 due to the alleged conflict between them. *Id.*

This Court rejected that argument for at least two reasons. First, Missouri statutes provide that in the case of adoption of conflicting amendments, the one receiving the largest affirmative vote will prevail.[15] *Id.* Second, and more fundamentally, this Court rejected the argument that because the two amendments both dealt with the issuance of revenue bonds for similar purposes they were in conflict and that amendment 7 (current article VI, section 27) prevailed over amendment 6 (current article VI, sections 27(a)-(c)) because it received more votes. Noting that only irreconcilable conflicts (and therefore not mere overlapping provisions) can justify ignoring the voters' will by declaring a constitutional amendment invalid, this Court held that although there is "some tension between [section 27 and sections 27(a), (b) and (c) ] ... [t]here is no irreconcilable conflict between the amendments, and ... both became part of the constitution." *Id.* at 620–21.

This Court reaffirms its holding in *Ashcroft* that "there is no conflict between the texts of the amendments." *Id.* at 620. Both section 27 and sections 27(a) and (b) are constitutional grants of authority to cities and other political subdivisions to issue revenue bonds for certain purposes under certain conditions.

These sections can be harmonized and present no irreconcilable conflict. While authority is granted under section 27 to issue revenue bonds upon satisfaction of certain requirements—including voter approval—not set out in section 27(b), and *vice versa*, this does not *ipso facto* mean that the two amendments are in conflict. Rather, they set out parallel methods of accomplishing the goal of issuing revenue bonds for the building of commercial power plants, among many other projects. While section 27 requires voter approval of such plants, section 27(b) provides an alternative method of authorizing such plants where they are to be leased to a private entity for commercial purposes and that entity will be responsible for the plant's cost, operation and maintenance. Neither section "is written in the form of a prohibition or limitation ... [rather] each ... is written as an affirmative grant of permission." *Cape Motor Lodge, Inc.*, 706

---

14. If one provision had been adopted later, the rule that the later-enacted statute repeals by implication the former could be applied to abrogate either the requirement of public voting (if section 27(b) were later enacted) or the permissibility of proceeding with only a majority vote of aldermen (if section 27 were later enacted). *Levinson v. State*, 104 S.W.3d 409, 412 (Mo. banc 2003) ("the later-enacted statute repeals the first statute to the extent of any conflict with the second"). But since repeal by implication is disfavored, *County of*

*Jefferson v. Quiktrip Corp.*, 912 S.W.2d 487, 490 (Mo. banc 1995), and these provisions were adopted simultaneously and are not in irreconcilable conflict, this Court must interpret them in concert and harmonize their provisions.

15. The relevant statute at the time was section 126.131, RSMo Supp.1975. A similar provision is now found at section 116.320, RSMo 2000.

S.W.2d at 212 (holding that permissive provisions do not prohibit what the other permits). Therefore, neither amendment contains such a prohibition on what the other permits. While it is rather unusual to authorize alternative methods of proceeding in two separate amendments, that is what occurred when both amendments were concurrently submitted to and approved by the voters. *Ashcroft* makes clear that this joint approval did not itself create an inherent conflict or require one amendment's terms to be given precedence over the other. By virtue of the people's simultaneous adoption of both of these amendments, the people's intention to authorize cities to issue revenue bonds through the alternative methods of either section 27 *or* sections 27(a) and 27(b) is manifest.

### IV. CONCLUSION

Peculiar's issuance of the revenue bonds upon the approval of the majority of Peculiar's aldermen was authorized under article VI, section 27(b) of the Missouri Constitution. The judgment is affirmed.

WOLFF, C.J., LIMBAUGH, and RUSSELL, JJ., and BLACKMAR, Sr.J., concur.

TEITELMAN, J., dissents in separate opinion filed; WHITE, J., concurs in opinion of TEITELMAN, J.,

PRICE, J., not participating.

RICHARD B. TEITELMAN, Judge, dissenting.

Article VI, section 27 required a vote of a majority of the qualified electors prior to issuing revenue bonds for the construction of the power plant at issue in this case. Therefore, I respectfully dissent.

Article VI, section 27 provides that a city may, by vote of a majority of qualified electors, issue revenue bonds for the purpose of constructing or improving "revenue producing water, sewer, gas or electric light works, heating or power plants. . . ." In contrast, Article VI, section 27(b) provides that a city may, without a vote of the people, issue revenue bonds for the purpose of constructing or improving any facility to be leased to private corporations for "manufacturing, commercial, warehousing and industrial development · purposes. . . ." Section 27 applies to this case. Peculiar issued revenue bonds for the purpose of paying all or part of the cost of constructing a revenue producing power plant. However, prior to issuing the revenue bonds, the city did not obtain voter approval as required by section 27. The circuit court erred in holding the voter approval was not required.

The majority opinion avoids the necessity of voter approval by holding that sections 27 and 27(b) provide alternate methods of authorizing the issuance of revenue bonds. Although section 27 refers specifically to "power plants" and section 27(b) does not, the majority concludes that the word "commercial," as used in section 27(b), must be broadly interpreted to include the generation of electricity by a power plant. While the word "commercial" is often used as a general reference to business-related activity, in this case, the word is used in a particular context. In section 27(b), the word "commercial" appears in the phrase "manufacturing, commercial, warehousing and industrial development. . . ." The majority opinion does not utilize this context to support its broad interpretation and instead analyzes the word in isolation, with reference to *King v. Laclede Gas Co.*, 648 S.W.2d 113 (Mo. banc 1983), a case which interpreted the word "commercial" as used in an unrelated tax statute. When a word is used in a list, the word is known by the company it keeps. *See, State v. Bratina*, 73 S.W.3d 625, 626 (Mo. banc 2002); *Pollard v. Board of Police Com'rs*, 665 S.W.2d 333, 345 (Mo. banc

1984). The better approach would be to assess the meaning of the word "commercial" in the context in which the word is actually used.

When analyzed in context, the word "commercial" as used in section 27(b) does not readily encompass power plants. Section 27 refers to revenue producing power plants. Section 27(b) does not reference power plants. If, as the majority concludes, the word "commercial" as used in section 27(b) means all forms of commerce, including power plants, then the reference in section 27(b) to "manufacturing ... warehousing, and industrial development" is arguably superfluous, as all those activities would fall under the broad umbrella of commercial activity.

A better reconciliation of sections 27 and 27(b) can be had by simply applying, in context, the plain language of the constitutional provisions. Thus, section 27(b) applies to commercial and industrial development projects but not to the power plant in this case, as section 27 specifically requires voter approval of revenue bonds for power plants. That voter approval would be required prior to issuing revenue bonds for the construction of a power plant is reasonable, considering the potentially dramatic, negative effects that a nearby power plant can have on property values and community well-being.

The majority opinion, rather than reconciling sections 27 and 27(b), renders the voting requirement of section 27 practically meaningless. Where the constitution requires a vote of the people, courts should be reluctant to make that requirement optional. I would reverse the circuit court's judgment to the extent it holds that there was no need for the people to vote on whether to issue the revenue bonds.