

# Missouri Court of Appeals

## Southern District

### In Division

VAN McGIBNEY, *et al.*,               )
                                      )
        Respondents,                  )
                                      )   No. SD36846
        vs.                           )
                                      )   **Filed:  August 26, 2022**
MISSOURI DEPARTMENT OF                )
NATURAL RESOURCES,                    )
                                      )
        Appellant.                    )

APPEAL FROM THE CIRCUIT COURT OF OREGON COUNTY

Honorable Steven A. Privette

**<u>REVERSED</u>**

The Department of Natural Resources ("DNR") appeals the declaratory judgment entered by the Circuit Court of Oregon County declaring the acquisition of properties along the Eleven Point Scenic River by DNR for the creation of a state park was invalid because DNR could not operate a state park that would also comply with the terms of an easement that ran with a portion of the properties.  The circuit court found the action of DNR unlawful, arbitrary and capricious and ordered DNR to divest itself of ownership of Eleven Point State Park lands located within the bounds of the easement.  DNR raised six points on appeal.  We find the circuit court erroneously declared and applied the law, and its declaratory judgment must be reversed.

## Factual Background

In 1968, Congress designated a 44-mile portion of the Eleven Point River in southeast Missouri a "Scenic River" under the Wild and Scenic Rivers Act, Pub. L. No. 90-542, codified in 16 U.S.C. § 1274(a)(2) (2010). This stretch of the river comprised nineteen (19) parcels of riverfront land, including the Pigman Ranch property and the properties now owned by Respondents, that subsequently were encumbered by scenic easements. These easements are held and administered by the United States Forest Service ("USFS").

In 1979, Reed Pigman, Jr., entered into an agreement granting the United States of America a scenic easement (the "Scenic Easement") over a portion of the Pigman Ranch. The Scenic Easement encumbers approximately 625 acres along the west side of a five (5) mile stretch of the Eleven Point River. The Scenic Easement was authorized by the Wild and Scenic Rivers Act of 1968 (the "Act"), which states:

> It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, **shall be preserved** in free-flowing condition, and that they and their immediate environments **shall be protected for the benefit and enjoyment of present and future generations**. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and **to fulfill other vital national conservation purposes**.

Wild and Scenic Rivers Act, Pub. L. No. 90-542 (emphasis added). The first page of the Scenic Easement states:

> WHEREAS, the Grantee, through the Forest Service, in accordance with P.L. 90-542 (82 Stat. 906), as amended by P.L. 93-279 (88 Stat. 122), desires to administer such land, to provide for and **protect the scenic, recreational, geologic, fish and wildlife, historic, cultural, and**

2

**other similar natural values of the free-flowing Eleven Point River** and its immediate environment, and other lands or interests therein of Grantee located within the River Zone, and to prevent any developments that will tend to mar or detract from their scenic, recreational, geologic, fish and wildlife, historical, cultural, or other similar values and natural qualities, and to that end exercise such reasonable controls over the land within the areas described in Exhibit "A" attached hereto as may be necessary to accomplish such objectives . . . .

(Emphasis added.)

The Pigman Ranch was subsequently divided into multiple parcels, two of which were sold — one to the Buildings for Babies Foundation and the other to the Fredrick Creek Ranch.

In 2015, DNR applied to the Southeast Missouri Lead Mining District Trustee Council ("Trustee Council") for funds to purchase the portions of the Pigman Ranch owned by the Frederick Creek Ranch and Buildings for Babies Foundation as eligible compensatory mitigation to receive funding from the Natural Resource Damages ("NRD") Trust due to lead mining damage in southeast Missouri.[1] The property consisted of 4,167 acres, of which approximately fifteen percent are encumbered by the Scenic Easement overseen by USFS.

The USFS supported DNR's purchase of the former Pigman Ranch properties to create a state park, including the fifteen percent covered by the Scenic Easement.[2] DNR

---

[1] This opinion includes quotations from the parties' briefs without further attribution.

[2] Defendant's Exhibit 4, a letter from Forest Supervisor William B. Nightingale to the Director of DNR dated July 29, 2015, stated as follows:

> It was very interesting to hear about the State park system and what the Missouri Department of Natural Resources (MoDNR) hopes to accomplish by developing a new park along the Eleven Point River in southeast Missouri.
>
> Mark Twain National Forest supports MoDNR's efforts to create a new park. The MoDNR's confirmation that it will "obey and strengthen current conservation easement provisions" was especially helpful in allowing us to provide support for such an endeavor. We will work cooperatively with the MoDNR to resolve any issues that may arise in the acquisition, development or management of this park.

3

committed to honoring the Scenic Easement in both proposals and their motions presented to the Trustee Council.  The Trustee Council approved DNR's proposal and funded the purchase of the Eleven Point State Park land, including the fifteen percent encumbered by the Scenic Easement, from NRD Trust moneys.

In 2016, DNR, through Missouri State Parks, acquired the Frederick Creek Ranch and the Buildings for Babies Foundation properties and created the Eleven Point State Park.  The deeds conveying the properties to DNR included the following language: "[t]he property is hereby dedicated for public use and conveyed to the Missouri Department of Natural Resources only for the following purposes and none other:  for public use as a state park and for natural resource restoration and preservation."

The Scenic Easement prohibits public access and the construction of buildings or other facilities within its boundaries.   Under the Scenic Easement, DNR, as the landowner, may in consultation with USFS:  plant and/or selectively cut or prune trees and shrubs to restore or to maintain the natural river quality and scenic views, and for the purposes of disease prevention measures; perform scenic, aesthetic, historical, fish and wildlife, and sanitation restoration as may be deemed necessary or desirable to promote and to protect the natural river qualities; and perform state wildlife management activities.  DNR may also mow, hay, limb diseased trees, or choose to do nothing with the land covered by the Scenic Easement.

The Eleven Point State Park land has historical and cultural significance due, in part, to abundant and distinctive natural features, including the Eleven Point River,

---

This letter should not be deemed to interpret or alter any legal authorities . . . including, but not limited to, the conservation easement held by the United States along the Eleven Point River, the Wild and Scenic Rivers Act, and the Mark Twain Forest Plan. . . .

We look forward to working with MoDNR on this endeavor.

4

forests, birds, and flora that are in nearly pristine condition. Additionally, the land has springs and ground water conduits that are important for water quality. The views from the high ground on the west side of the Park outside the Scenic Easement allow visitors to behold the vast expanse of the Eleven Point river valley.

Since acquiring the Eleven Point State Park land in 2016, DNR has primarily left it in its natural condition. Due to the uncertainty brought by this lawsuit and the fact that four new State Parks were acquired at the same time, DNR has not yet fully developed the plans necessary to open the Eleven Point State Park.

### Procedural Background

In 2017, Respondents brought a declaratory judgment action asking the Oregon County Circuit Court to declare that DNR's 2016 acquisition of properties along the Eleven Point Scenic River for the creation of a state park was invalid because DNR could not lawfully operate a state park and simultaneously comply with the terms of the Scenic Easement. Respondents further requested that the trial court declare that DNR had no authority to promulgate rules or regulations to acquire and possess such encumbered land or otherwise expend any tax money for the maintenance, improvement, acquisition or preservation of those encumbered properties.

Respondents are: Van and Elizabeth McGibney, and the James Conner Irrevocable Trust, represented by successor trustee Luke David Conner. At no time during acquisition of the properties were Respondents involved in DNR's contract or contract negotiations, and they are not and have not been parties to the Scenic Easement on park land. At no time did Respondents own the properties at issue, nor did they contemplate doing so.

Following a one-day bench trial on August 4, 2020, the trial court found that the evidence established that 625 of the 4,197 acres purchased by DNR was subject to the

5

Scenic Easement because DNR's predecessor in interest conveyed the easement rights to the United States Department of Agriculture prior to DNR's purchase. The Director of Natural Resources Management Programs for DNR, Ken McCarty, testified that DNR had considered purchasing land in this area for several years. Respondents testified about the great scenic and cultural value of the property. Respondents testified that they opposed the use of the property as a state park and that if the Scenic Easement was modified to allow public use of the property acquired by DNR that would destroy the wild and scenic nature of the easement land.

The circuit court found that §253.040[3] defined "the authority of DNR to acquire real property for 'park or parkway purposes . . . where such action would promote the park program and the general welfare.'" The circuit court found that through Mr. McCarty's testimony DNR acknowledged "that the purpose of the park, which bears the name Eleven Point River Park, was for access, use and enjoyment of the Eleven Point River, presumably by the public whose funds are or were expended in the acquisition and maintenance of the property." The circuit court found that "the [Act] prohibits public use and the state park enabling statute provides the lands may be acquired by the State for 'use by the public.'" The circuit court held that "[t]he two uses seem to be in direct opposition," and stated that it "is unable to find any use by the public allowed under the provisions of the Act." Further, the circuit court pronounced that it did not believe any such use is intended to be allowed under the Act. The circuit court also cited to the deeds from the respective grantors to DNR and determined that it could not find any public use for real property upon which there exists such a restrictive easement excluding use by the

---

[3] Unless otherwise indicated, statutory references are to RSMo (2016).

public.  The circuit court went on to point out examples of uses prohibited by the Scenic Easement, including campsite usage, road or building construction, launching of watercraft, utility right of way, easement access to the river, public entry, and public vehicle access.  The circuit court found that DNR had acquired state park lands which cannot under any reasonable interpretation be used by the public as a park and therefore such actions were arbitrary and capricious.  The trial court issued judgment in favor of Respondents and ordered DNR "to divest itself of ownership of those lands located within the bounds of the Wild and Scenic Easement."  DNR timely appealed.

## Standard of Review

> The standard of review in this action for a declaratory judgment and injunctive relief is the same as in any court-tried case:  the judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. ***Dohogne v. Counts***, 307 S.W.3d 660, 665-66 (Mo.App. 2010).  Claims that the circuit court erroneously declared and applied the law are reviewed *de novo*. ***Adams v. Certain Underwriters at Lloyd's of London***, 589 S.W.3d 15, 26 (Mo.App. 2019).  To the extent this Court's review involves the interpretation of statutes and constitutional provisions, the Court construes the words used in those provisions according to their plain and ordinary meaning. ***StopAquila.org v. City of Peculiar***, 208 S.W.3d 895, 902 (Mo. banc 2006).

***Elevation Enters., LLC v. City of Springfield***, No. SD37129, slip op. at *3 (Mo.App. June 8, 2022) (quoting ***Allsberry v. Flynn***, 628 S.W.3d 392, 395 (Mo. banc 2021).

> Following a circuit court's judgment in a § 536.150 proceeding to review an agency's decision in a non-contested case, an aggrieved party may appeal. ***State ex rel. Christian Health Care*** [***v. Mo.Dep't of Health and Senior Servs.***], 229 S.W.3d [270,] 275.  We review the judgment of the circuit court, rather than the decision of the administrative agency. ***Id.***  An appellate court "reviews the circuit court's judgment to determine whether its finding that the agency decision was or was not unconstitutional, unlawful, unreasonable, arbitrary, capricious, or the product of an abuse of discretion rests on substantial evidence and correctly declares and applies the law." ***Missouri Nat. Educ. Ass'n v. Missouri State Bd. of Educ.***, 34 S.W.3d 266, 275 (Mo.App. 2000).  This standard requires an appellate court to accept the trial court's credibility determinations and view the

7

evidence in the light most favorable to the judgment, while disregarding all contrary evidence and permissible inferences. *State ex rel. Koster v. Morningland of the Ozarks, LLC*, 384 S.W.3d 346, 350 (Mo.App. 2012). Our summary of facts . . . has been prepared in accordance with these principles.

*Ard v. Shannon Cnty. Comm'n*, 424 S.W.3d 468, 473 (Mo.App. 2014).

## Discussion

Essentially, this case is about whether DNR, through its Division of State Parks, has the authority to acquire, hold, and maintain land as a state park when a portion of the land is encumbered by a federal easement restricting the public's access. Sections 253.040 and 253.010 establish DNR's clear and unambiguous authority to acquire any land to hold, preserve, improve, and maintain as a park. Missouri law grants DNR expansive authority and discretion under § 253.040.1, to acquire and maintain any land it sees fit for park purposes:

> The department of natural resources is hereby authorized to accept or acquire by purchase, lease, donation, agreement or eminent domain, any lands, or rights in lands, sites, objects or facilities which *in its opinion* should be held, preserved, improved and maintained for park or parkway purposes. The department of natural resources is authorized to improve, maintain, operate and regulate any such lands, sites, objects or facilities when such action would promote the park program and the general welfare.

(Emphasis added.)

The General Assembly defined "Park" in § 253.010(3) as:

> [A]ny land, site or object primarily of recreational value or of cultural value because of its scenic, historic, prehistoric, archeologic, scientific, or other distinctive characteristics or natural features.

"The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Li Lin v. Ellis*, 594 S.W.3d 238, 241–42 (Mo. banc 2020) (quoting *Howard v. City of Kansas City*, 332 S.W.3d 772,

779 (Mo. banc 2011)). When the statute's language is plain and unambiguous, a court must give effect to the legislature's chosen language and may not add words by implication. *State ex rel. Young v. Wood*, 254 S.W.3d 871, 873 (Mo. banc 2008)*; see also* *W.C.H. v. State*, 546 S.W.3d 612, 615 (Mo.App. 2018). "This Court will not add words to a statute under the auspice of statutory construction." *Li Lin*, 594 S.W.3d at 242 (quoting *Macon Cnty. Emergency Servs. Bd. v. Macon Cnty. Comm'n*, 485 S.W.3d 353, 355 (Mo. banc 2016)).

### *Acquisition of Park Land and Easement Restrictions*

DNR may acquire any lands for park or parkway purposes and no other restriction or limitation is placed on DNR under § 253.040.1. An easement restricting particular rights or uses on a property does not interfere with DNR's ability to acquire and possess such property for park purposes. *Id.* The Scenic Easement's restrictions on the use of park property are actually consistent with DNR's constitutional duty to "administer . . . the conservation . . . of natural resources" and its statutory obligation to preserve land with "scenic, historic, prehistoric, archeological, scientific, or other distinctive characteristics or natural features." MO CONST. art. IV, § 47; §§ 640.010.1, 253.010(3), 253.035, 253.040. The plain language and unambiguous meaning of § 253.040, is that DNR may acquire any land when, in DNR's opinion, that land should be held, preserved, improved, and maintained for park purposes, and the land meets the statutory definition of "park." The Court must interpret statutory language as written and may not "add statutory language where it does not exist." *Peters v. Wady Indus., Inc.*, 489 S.W.3d 784, 792 (Mo. banc 2016) (quoting *Frye v. Levy*, 440 S.W.3d 405, 424 (Mo. banc 214)).

9

***Cultural and Scenic Value of Eleven Point State Park***

Both properties have recreational and cultural value due to their scenic nature, distinctive characteristics, and wild and natural features. Respondents testified about the great scenic and cultural value of the property. Park visitors will be able to behold the expansive vista of the Eleven Point River and the lands encumbered by the Scenic Easement from many portions of the park not subject to the easement. These properties fall within the statutory definition of a "park" that DNR is authorized to acquire and maintain.

***DNR's Authority to Acquire Land***

*Circuit Court's Misapplication of § 253.040*

The circuit court erroneously declared and misapplied the law governing DNR's authority to acquire land under § 253.040. The court's judgment stated "the state park enabling statute provides lands may be acquired by the State for 'use by the public[,]'" but "use by the public" is found nowhere in DNR's enabling statutes.[4] Section 253.040 only restricts DNR's land acquisitions to those for park or parkway purposes. The circuit court altered the meaning of DNR's authorizing statute by adding statutory language where it did not exist. The circuit court, and this court, must interpret statutory language as written and may not add language where it does not exist, such as the "use by the public" language added by the circuit court. ***Peters***, 489 S.W.3d at 792.

---

[4] We recognize that the deeds conveying title of the Frederick Creek Ranch and the Buildings for Babies Foundation property to DNR contained the following language, which includes a "public use" requirement:

> The property is hereby dedicated to public use and conveyed to the Missouri Department of Natural Resources only for the following purposes and none other: **for *public use as a state park and for natural resource restoration and preservation***.

(Emphasis added.)

*DNR's Ability to Restrict Usage of Park Lands under § 253.035*
*and the Derivative Regulations*

DNR also has broad authority to manage, regulate, and restrict the public's physical access onto those lands under § 253.035, which authorizes the Director of DNR to make and promulgate rules and regulations "necessary for the proper maintenance, improvement, acquisition and preservation of all state parks." In fact, DNR's regulations created a system that allows DNR to prohibit the public's physical access onto portions of its state park properties for a variety of reasons.

Specifically, the Director of DNR has promulgated the following regulations limiting public access and activities across portions of Missouri's state parks:

> 10 CSR 90-2.040(6)[5]: Certain areas within state parks and historic sites possessing unusual natural significance and being vulnerable to damage resulting from public access **shall be designated as limited access areas** by the director. Areas so designated shall be properly posted. Entrance to limited access areas shall require the permission of the facility manager.
>
> . . . .
>
> 10 CSR 90-2.030(27)(A): [T]he division maintains the right to **prohibit or otherwise restrict recreational activities** that are not in keeping with the mission and objectives of the Department of Natural Resources, that may damage property, that require special safety measures, or that conflict with other uses of an area. Such prohibitions or restrictions shall be determined by the director, who may establish policy or procedures to regulate conduct.
>
> . . . .
>
> 10 CSR 90-2.030(27)(C): Additional **recreational activities may be restricted** by policies established.

These regulations establish DNR's authority to restrict public access onto portions of

---

[5] All regulatory citations are to Missouri Code of State Regulations (2019).

11

Missouri state parks and would apply to the Eleven Point State Park.[6]  Section 253.035, 10 CSR 90-2.040, 10 CSR 90-20.030.  Thus, DNR is authorized to prohibit the public from entering portions of the park encumbered by the Scenic Easement to accomplish its stated goals of preserving and restoring the encumbered parklands to their natural scenic qualities, e.g, 10 CSR 90-2.040(6), 10 CSR 90-2.030(27)(A), 10 CSR 90-2.030(27)(C). Eighty-five percent of the Eleven Point State Park is unencumbered by the Scenic Easement, enabling the public to view the river and easement lands from the unencumbered land.  There are other state parks in Missouri, including Onondaga Cave State Park and Orchid Valley Natural Area, with restricted areas or areas otherwise closed to the public.  Those restricted park areas exist so Missouri may preserve and maintain these historic, natural, and cultural sites for the public's benefit and for the general welfare; not so the public may walk on every inch of park land.

The trial court's judgment holding that the public's actual physical access to 100% of park land is a requirement for DNR to acquire and possess land for park purposes, in spite of DNR's plain statutory and regulatory authority to the contrary, is in direct contradiction to the plain language of DNR's authorizing statutes and regulations. Sections 253.040.1, 253.010(3), 253.035; 10 CSR 90-2.040(6), 10 CSR 90-2.030(27)(A), 10 CSR 90-2.030(27)(C).

The circuit court misstated the statute by adding a "use by the public" standard for DNR to acquire and hold land and further confused the issues by deciding  public use can never be achieved unless the public has unrestricted physical access to the entirety of DNR's park lands.  The statute authorizing DNR to acquire land does not require "public

---

[6] Respondents did not challenge the validity or application of these regulations.

use" and neither do the terms of the Scenic Easement or the Act. *See* § 253.040. The trial court's imposition of a "use by the public" requirement onto DNR's land acquisitions when no such requirement exists, and the trial court's further confusion of the issues by conflating "public use" with the public's unrestricted physical access to all corners of park properties, are erroneous and unsupported in statute, regulation, case law, and the historical practices of parks in Missouri. The statutory definition says that parks are "any land, site or object primarily of recreational value *or* of cultural value because of its scenic, historic, prehistoric, archeological, scientific, or other distinctive characteristics or natural features" and nowhere in that definition is there a public access requirement. Section 253.010(3) (emphasis added).

There is no public access requirement encompassed within the concept of "public purpose." Courts have consistently held that environmental preservation, remediation, and preservation of the state's natural resources, are "public purposes," and none of those objects require the public's actual physical presence on all corners of park properties. *See State ex inf. Danforth ex rel. Farmers' Elec. Co-op., Inc.*, 518 S.W.2d at 74 (the general welfare is promoted by preserving Missouri's natural resources); *Arata v. Monsanto Chem. Co.*, 351 S.W.2d 717, 721 (Mo. 1961) (public use does not necessarily require the whole community or any large part of it actually use or be benefitted by a contemplated improvement); *Swallow Tail, LLC*, 522 S.W.3d at 315 (the preservation of the state's natural resources is for a public purpose); *Friends of Shawangunks, Inc. v. Clark*, 754 F.2d 446, 449 (2d Cir. 1985) (public use is not synonymous with public access).

The trial court conflated public use and public access throughout its analysis. The trial court stated that the Scenic Easement prohibits public use, when it merely prohibits

public *access*.

*Wild and Scenic Rivers Act does not Preclude Public Use*

Finally, the trial court stated that the Act precludes public use, but the Act contains no terms prohibiting public use of the encumbered property. Wild and Scenic Rivers Act, Pub. L. No. 90-542 (1968)  DNR's intended public uses of natural preservation and restoration are consistent with the language and intent of the Act:

> It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, **shall be preserved** in free-flowing condition, and that they and their immediate environments **shall be protected for the benefit and enjoyment of present and future generations**. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and **to fulfill other vital national conservation purposes**.

Wild and Scenic Rivers Act, Pub. L. No. 90-542 (1968) (emphasis added).

Evidence at trial established DNR's acquisition and possession of the park property for purposes of natural preservation and restoration. Those are public purposes within DNR's authority to acquire and maintain properties for park purposes and within the scope of the Act. Section 253.010(3). Neither law requires unrestricted public access for DNR to acquire and maintain the properties at issue for park purposes. Wild and Scenic Rivers Act, Pub. L. No. 90-542 (1968), § 253.010(3).

### DNR's Intended Use of Land is Supported by the Scenic Easement and the Wild and Scenic Rivers Act

DNR's intended use of the encumbered portions of the Eleven Point State Park property for preservation and restoration purposes is supported by the Scenic Easement and the Act.

14

Both the Frederick Creek Ranch and the Buildings for Babies Foundation property deeds contain the following identical language:

> The property is hereby dedicated to public use and conveyed to the Missouri Department of Natural Resources only for the following purposes and none other: for *public use as a state park* **and for natural resource restoration and preservation**.

(Emphasis added.) By the property deeds' own language and intent, "public use" is satisfied when DNR manages and operates the properties as a state park and for natural resource restoration and preservation, which present no conflict with DNR's authority to acquire and maintain these properties for park purposes. *See* §§ 253.040 and 253.010.

Likewise, the Scenic Easement and the Act present no conflict with DNR's authority to acquire and maintain these park lands. The purpose of the Scenic Easement is nearly identical to its authorizing statute, the Wild and Scenic Rivers Act, Pub. L. No. 90-542 (1968). The Scenic Easement indicates its objective is to provide for and to protect the natural values of the Eleven Point River. The first page of the Scenic Easement states:

> WHEREAS, the Grantee, through the Forest Service, in accordance with P.L. 90-542 (82 Stat. 906), as amended by P.L. 93-279 (88 Stat. 122), desires to administer such land to provide for and protect the scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar natural values of the free-flowing Eleven Point River and its immediate environment, and other lands or interests therein of Grantee located within the River Zone, and to prevent any developments that will tend to mar or detract from their scenic, recreational, geologic, fish and wildlife, historical, cultural, or other similar values and natural qualities, and to that end exercise such reasonable controls over the land within the areas described in Exhibit "A" attached hereto as may be necessary to accomplish such objectives.

This is further supported by the Scenic Easement's authorizing statute, the Wild and Scenic Rivers Act, Pub. L. No. 90-542 (1968), which states in pertinent part:

> Sec. 1(b) It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational,

15

geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.

. . . .

Sec. 10(a) Each component of the national wild and scenic rivers system shall be administered in such a manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of those values. In such administration primary emphasis shall be given to protecting its aesthetic, scenic, historic, and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

The purpose of the Act is to protect nationally recognized rivers and their immediate environments. *Id.* Both the Scenic Easement language and the Act support the preservation and protection of the encumbered lands of Eleven Point State Park. Here, the trial court arrived at the incorrect conclusion that:

[t]he two uses seem to be in direct opposition. The federal act prohibits public use and the state park enabling statute provides lands may be acquired by the State for 'use by the public'

. . . . The [c]ourt is unable to find any use by the public allowed under the provisions of the Act, nor does the [c]ourt believe any such use is intended to be allowed under the Act.

. . . .

The [c]ourt cannot find a public use for real property upon which there exists such a restrictive easement as herein specifically excluding use by the public.

DNR's enabling statute does not require "public use;" nor does the Scenic Easement or the Act prohibit "public use."

16

No legal impediment to DNR's statutory authority to acquire the encumbered properties for the park purposes of natural preservation and restoration is present in the Frederick Creek Ranch and Buildings for Babies Foundation property deeds, the Scenic Easement, or the Act.

## Conclusion

The circuit court's declaratory judgment is reversed because the circuit court erroneously declared and misapplied the law governing DNR's authority to acquire land under § 253.040.

JACK A. L. GOODMAN, C.J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

MARY W. SHEFFIELD., J. – CONCURS